JOAN BERNARD ARMSTRONG, Chief Judge.
| ,The defendant-appellant, Bell Helicopter Textron, Inc. (“Bell”), appeals a judgment in favor of the plaintiffs-appellees, Petroleum Helicopters, Inc. and its insurers, National Union Fire Insurance Company of Louisiana, Houston Casualty Company, Global Aerospace, Inc. and Certain Underwriters at Lloyds of London and Various Insurers through JLT Risk Solutions, Ltd. Aerospace, granting “the redhi-bition claim of PHI and PHI’s insurers ... in its entirety,” in the sum of $2,550,000.00 “for amounts paid to PHI for the loss of Helicopter” and $87,387.00 for search and salvage costs related to the retrieval of the Helicopter following this casualty.” PHI was also awarded $150,000.00 “representing the uninsured portion of the Helicopter” which the trial court found “had a fair market value of $2,700,000.00 immediately prior to this casualty.”
While Bell contests liability on various grounds, it does not assign as error the calculation of any of the amounts set forth in the preceding paragraph.
The plaintiffs’ claims arise out of the loss of a 14 year-old helicopter in the Gulf of Mexico in August of 2004 that PHI purchased from Bell. The helicopter was used by PHI to ferry workers to and from *969 offshore platforms. The helicopter made a forced landing in the Gulf of Mexico when the tail rotor gearbox fractured |2and together with most of the tail rotor assembly, separated from the aircraft. Approximately two hours later, after the pilot and all passengers had been rescued, the helicopter turned over in the water. Although the helicopter was later recovered, PHI claims that the saltwater exposure rendered the helicopter a total loss.
On November 12, 2004, Richard Tucker, who had been a passenger in the helicopter, and his wife Linda Tucker, filed this suit against PHI, its pilots, and mechanics “pursuant to the General Maritime Laws of the United States of America,” asking for damages for personal injuries, past and future medical expenses, past and future lost wages and impairment of earning capacity. The Tuckers’ claims form no part of this appeal. PHI added Bell as a third-party defendant on August 25, 2005, seeking only tort indemnity for any damages it might have to pay to Tucker. Tucker amended his petition on June 18, 2006, to add a direct claim against Bell, again invoking maritime law. Later, PHI’s insurers were granted leave to intervene as PHI’s subrogees asserting a hull claim under the general maritime law. On July 26, 2007, PHI’s insurers filed an amended petition in intervention, asserting various theories of recovery, including implied warranty and redhibition.
Bell contends that the original purchase by PHI of the helicopter from Bell on March 30, 1990, as well as the subsequent purchase of certain allegedly defective replacement parts were all subject to express written waivers of warranty provisions precluding the plaintiffs’ claims for redhibition.
The original 1990 purchase agreement for the helicopter contained the following warranty provision:
JgTHIS WARRANTY IS GIVEN AND ACCEPTED IN PLACE OF (i) ALL OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE AND (ii) ANY OBLIGATION, LIABILITY, RIGHT CLAIM OR REMEDY IN CONTRACT OR IN DELICT/TORT, INCLUDING PRODUCT LIABILITIES BASED UPON STRICT LIABILITY OR NEGLIGENCE, ACTUAL OR IMPUTED.
This warranty is the only warranty made by Seller. The remedies of Purchaser and obligations and Seller are limited to the repair or replacement of helicopter parts as provided herein. Seller excludes liability, whether as a result of a breach of contract or warranty, negligence, or strict product liability, for incidental or consequential damages, including without limitation, damage to the helicopter or other property, costs and expenses resulting from required changes or modifications to helicopter components and assemblies, changes in retirement lives and overhaul periods, and costs or expenses for commercial losses or lost profits due to loss of use or grounding of helicopter or otherwise.
Bell contends that this waiver found in the original purchase not only precluded redhibition claims in connection with the helicopter and its original component parts, but also precluded the raising of any redhibition claims as regards any replacement or component parts. Additionally, Bell argues that each purchase of subsequent replacement parts, including the purchase in 2000 of the tail rotor blades *970 that were on the helicopter when it went down in August 19, 2004, “also included a warranty with disclaimers that mirror the warranty exclusion in the Purchase Agreement for the helicopter.” In other words, Bell makes two waiver of redhibition arguments: First, that the original purchase agreement | included a waiver with language broad enough to encompass the subsequent purchase of replacement component parts. We disagree with this argument for both legal and public policy reasons, i.e., we find that a waiver of red-hibition is ineffective as to indefinite purchases in the indefinite future. La. C.C. art. 2548 requires in pertinent part that:
The terms of the exclusion or limitation must be clear and unambiguous and must be brought to the attention of the buyer.
We find that this language requiring that the waiver be brought to the attention of the buyer necessarily implies that it must be brought to the attention of the buyer in connection with the purchase that is under attack for redhibition. It is not sufficient to bring it to the attention of the buyer in connection with some purchase in the past. In this case, the helicopter was originally purchased by PHI from Bell on March 30, 1990, more than 10 years prior to the purchase of certain replacement parts in 2000 that allegedly resulted in the loss of the helicopter on August 19, 2004. Calling this provision to the attention of PHI in 1990 does nothing to satisfy the requirement of calling it to the attention of PHI in 2000 when PHI purchased the replacement parts in 2000. Bell points to no evidence in the record showing that it reminded PHI of this waiver in 2000 and the law does not require even a sophisticated purchaser (as Bell argues PHI to be) to search back ten years in its files to review an old purchase contract to see if there are waiver or limitation of warranty provisions that may be applicable to a future purchase.[1]
The trial court judgment also holds that: The Court specifically finds that Bell did not carry its burden of proving that PHI waived the legal warranty | ¿against red-hibitory defects in connection with its purchase of the tail rotor blades from Bell. Further, the Court finds that, pursuant to La. Civ.Code art. 2548, even if such a waiver of warranty had been established, Bell would not be entitled to enforce the waiver.
The burden is on Bell to establish the existence of an applicable and valid warranty waiver. Berney v. Rountree Olds-Cadillac Co., Inc., 33, 388 (La.App. 2 Cir. 6/21/00), 763 So.2d 799; Moses v. Walker, 98-58, p. 3 (La.App. 3 Cir. 6/17/98); 715 So.2d 596, 598. Whether there is an effective waiver of warranty is a question of fact that will not be disturbed by an appellate court in the absence of manifest error. Id. By way of analogy, see Laura’s Prods., Inc. v. 600 Conti Street, LLC, 07-819, pp. 5-6, (La.App. 4 Cir. 4/9/08), 982 So.2d 934. In order to bear its burden that the alleged waiver of warranty was effective, Bell must prove that the waiver was: (1) written in clear and unambiguous language; (2) contained in the contract; and (3) either brought to the attention of the buyer or explained to him. Boos v. Benson Jeep-Eagle Co., Inc., 98-1424 (La.App. 4 Cir. 6/24/98), 717 So.2d 661.
We can find no manifest error in the trial court’s finding that Bell “did not carry its burden of proving that PHI waived *971 the legal warranty against redhibitory defects in connection with its purchase of the tail rotor blades from Bell.” While Bell offered copies of exemplar warranties supposedly identical to the one that was allegedly included by Bell in conjunction with the purchase of the tail rotor blades along with several hundred pages of invoices concerning spare parts transactions with PHI, none of the invoices addressed to PHI contained any warranty waiver and the exemplar forms that did contain warranty waivers were admittedly only examples and not the forms allegedly actually supplied by Bell to PHI in connection with the tail rotor blade purchase. None of Bell’s witnesses could state |fiunder oath that PHI actually received a specific warranty waiver — or whether PHI had knowledge of and agreed to be bound by any such waiver.
Bell contends that the claim for the loss of the helicopter is (1) strictly an admiralty or maritime claim (2) for economic loss only and (3) that under the Supreme Court’s decision in East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) no claim can be brought against Bell by PHI under Louisiana state law theories of negligence or strict liability.
First, as to the second premise of Bell’s argument, that PHI’s claim for the loss of the helicopter is one for economic loss only, that is uncontested.
As to the first premise of Bell’s argument, that PHI’s claim is maritime or admiralty in nature, Bell contends that the general maritime law applies whenever the incident giving rise to the claim occurred on navigable waters (in the Gulf of Mexico in the instant case) and the activity giving rise to the incident bears a substantial relationship to a traditional maritime activity, citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). As the Louisiana Supreme Court explained in Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), this applies even to helicopters such as the one at issue in the instant appeal:
Generally, federal maritime jurisdiction is invoked whenever an accident occurs on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Offshore Logistics v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986); Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). The United States Supreme Court has stated that although a helicopter is not a “traditional maritime conveyance”, when it is used to ferry passengers from an island to the shore or vice versa it is engaged in a function traditionally performed by waterborne vessels. Tallentire, 477 U.S. at 217, 106 S.Ct. at 2492. [Emphasis added.]
Id., at 636-637.
The Louisiana Supreme Court in Green went on to note that while the United States Constitution grants to federal district courts jurisdiction in all “cases of admiralty and maritime jurisdiction,” that state courts have concurrent jurisdiction by virtue of the “savings to suitors” clause of the Judiciary Act of 1789. Id., at 637. The Green court also explained that while a state may not deprive a person of substantial maritime rights, there are occasions when a state may supplement those rights. Id., at 643. Indeed, a state is allowed “wide scope” in this regard. Id. The Green decision next describes numerous examples of such state supplementation and concludes that they have been allowed “even, at times, when they conflicted with a rule of maritime law which did not require uniformity, citing Romero v. Inter *972 national Term. Operat. Co., 358 U.S. 354, 373, 79 S.Ct. 468, 480-481, 3 L.Ed.2d 368 (1959). Green, at 643.
Consequently, we are compelled to find that the PHI’s redhibition claim falls within the ambit of permissible state supplementation of maritime policies as explained in Green. Therefore, regardless of whether this is a maritime case, PHI is entitled to assert Louisiana state law claims for implied warranty and redhibition.
Moreover, we find that maritime law does not exclude PHI’s redhibition claim as it is by its very nature a warranty claim and is referred to as such throughout the Civil Code articles on redhibition. La. C.C. art. 2520, 2521, 2522, 2530, and 2548.
Bell places great reliance on Petroleum Helicopters, Inc. v. Avco Corporation, 930 F.2d 389, 391-392 (5th Cir.1991), in support of its contention that |SPHI has no claim under maritime law for negligence or strict liability or products liability based on the following pronouncements from that decision:
In East River, 476 U.S. at 876, 106 S.Ct. at 2304, the Court held that “whether stated in negligence or strict Lability, no products-liability claim lies in admiralty when the only injury claimed is economic loss.” FN5 East River involved a strict products liability and negligence suit by charterers of oil transporting tankers against the manufacturer of the tankers’ turbine engines, which were damaged as a result of alleged design defects in a small engine part. The Court stated that “a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.” Id. at 871, 106 S.Ct. at 2302. It reasoned that when the only damage is economic loss to the product itself, the purchaser has simply lost the benefit of its contractual bargain and should be limited to its contractual warranty remedies. Id. at 872-76,106 S.Ct. at 2302-04.FN6 FN5. It is undisputed that maritime law governs PHI’s claims under 28 U.S.C. § 1333, even though PHI asserts that diversity jurisdiction under 28 U.S.C. § 1332 may also apply.
FN6. The Court in East River pointed out that in the commercial setting in the maritime industry, parties are free to bargain for the terms of their contract, including warranties and risk allocation. 476 U.S. at 872-75, 106 S.Ct. at 2302-04. The Court also indicated that even if the parties exclude warranty remedies in their contract, they are still bound by the terms of their contract for purely economic loss and cannot seek additional remedies in tort:
Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies.... In exchange, the purchaser pays less for the product. ... Since a commercial situation generally does not involve large disparities in bargaining power, ... we see no reason to intrude into the parties’ allocation of the risk.
Id. at 872-73, 106 S.Ct. at 2303 (citations omitted).
Petroleum Helicopters, Inc. v. Avco Corporation, 930 F.2d 389, 391-392 (5th Cir. 1991).
The statements quoted above in Petroleum Helicopters, Inc. v. Avco Corporation from the Supreme Court’s East River decision form the crux of Bell’s legal argument: “[WJhether stated in negligence or strict liability, no products-liabili *973 ty claim lies in admiralty when the only injury claimed is economic loss,” and “a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.” To express it another way, Bell, in effect, argues that PHI has failed to state a claim upon which relief can be granted because it is (1) maritime in nature, (2) a claim for economic loss only and (3) under such circumstances there is no claim for negligence or strict liability or products liability. However, as stated previously, the trial court award to PHI was based on redhibition, a warranty based theory of recovery under La. C.C. art. 2520. The first paragraph of La. C.C. art. 2520 declares that: “the seller warrants [2] the buyer against redhibi-tory defects, or vices, in the thing sold.”
Therefore, this Court does not see where East River or any of its progeny preclude recovery in a Louisiana court for a redhibition claim which is a warranty based claim. In fact, the cases relied upon by Bell take the position that warranty is the proper theory of recovery in such transactions as may be seen by frequent use of the term “warranty” in the language quoted above from Petroleum, Helicopters, Inc. v. Avco Corporation.
hoA claim in redhibition has been recognized as being distinctly different from a tort claim. Patin v. Thoroughbred Power Boats, Inc., 294 F.3d 640, 656 (5th Cir.La. 2002). It is well established in Louisiana law that a redhibition claim is contractual in nature. Landry v. Forest River, Inc., 06-1424, p. 5 (La.App. 3 Cir. 3/14/07), 953 So.2d 1046, 1050. It arises from a breach of a warranty of a thing sold by a seller. Id.
In Petroleum Helicopters, Inc. v. Avco Corporation, the court explained how it had applied East River in Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925 (5th Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988). In doing so, the court found that in Shipco it was determined that “the warranty provisions of the contract between the two parties should govern the dispute.” Petroleum Helicopters, Inc. v. Avco Corporation, supra, at p. 392. Likewise, in the instant case, the plaintiffs are entitled to pursue their redhibition (warranty) claim in the courts of this State.
We find that the following language in Turbomeca v. Era Helicopters, 536 F.3d 351 (5th Cir.La.2008), seems to support PHI’s redhibition claim which is basically a warranty claim:
Thus, where a defective product malfunctions and causes damage only to itself, the rule is that a plaintiff can maintain an economic loss claim only under a warranty or contract theory of recovery.
Later, in Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997), the Supreme Court explained the rationale behind the East River rule:
The Court [in East River] reasoned that the loss of the value of a product that suffers physical harm — say, a product that destroys itself by exploding — is very much like the loss of the value of a product that does not work properly or does not work at all. In all such cases, the InCourt held, “contract law, and the law of warranty in particular, is well suited” to setting the responsibilities of a seller of a product that fails to perform the function for which it was intended. Id. at 879-80, 106 S.Ct. 2295 (citations omitted). The Court instructed that “[g]iven the availability of warranties, *974 the courts should not ask tort law to perform a job that contract law might perform better.” Id. at 880, 106 S.Ct. 2295.
Id., at pp. 354-355. The judgment by the trial court was based on warranty, that is, the warranty of Louisiana’s law of red-hibition. And, there is no proof in the record that PHI waived that warranty. Moreover, the only award made by the trial court was for economic loss pursuant to that warranty. We find that the redhi-bition warranty relied upon by the trial court supplements the maritime law in this regard, but does not conflict with it. Green v. Industrial Helicopters, Inc., supra, 593 So.2d at 636-637.
ERA Helicopters v. Bell Helicopter Tex-tron, Inc., 696 F.Supp. 1096 (E.D.La.1987), by implication supports PHI’s position as the court relied on the warranty in the contract in reaching its decision to deny recovery. In ERA Helicopters the court, applying Louisiana law, found that the written warranty had expired by its own written terms limiting it to one year or 1,000 hours, “whichever comes first,” saying:
Under Louisiana law, the words of a contract must be given their generally prevailing meaning. La.Civ.Code Ann. Art 2047.
Id., at 1099.
Therefore, following the reasoning in ERA Helicopters, we find that the trial court did not err in providing PHI with a warranty remedy, in this case the warranty called for in the law of redhibition. Moreover, as we have explained 1 ^previously in this opinion, the trial coui’t did not err in finding that PHI did not waive the redhibition warranty and we found no evidence in the record of any limitation of warranty in any way analogous to that found in ERA Helicopters.
Additionally, we note that Bell in its reply brief states that: “Bell concedes that redhibition is a contractual claim to which PHI would be entitled under East River, had it made such a claim prior to Bell’s Motion for Partial Summary Judgment.” In making this statement it appears that Bell is referring to its argument that the trial court erred in allowing PHI’s insurers to amend their petition in intervention to state a claim in redhibition. However, the trial court has broad discretion to allow such amendments, and we find no abuse of that discretion. Munster v. Bill Watson Ford, Inc., 07-0294, p. 3, FN. 3 (La.App. 4 Cir. 10/24/07); 970 So.2d 36, 39; Brown v. Associated, Ins. Consult, Inc., 95-451, 95-452, 95-453 (La.App. 1 Cir. 4/4/96); 672 So.2d 324, 330.
Finally, we find that the following colloquy between the trial judge and the various attorneys indicates that the amended complaint was tried by consent:
MR. CUNNINGHAM:
Now another thing, Your Honor, just as housekeeping. This has nothing to do with the post-trial brief. We have a Motion for Leave to file an amended complaint that was filed 10 days before trial.
We never set it for hearing, it was never ruled on. I believe it’s been tried by consent, if not — It was already in the record anyway. Could we ask the Court’s indulgence to grant leave and accept the amended complaint?
MR. NORWOOD:
As I understand the amended complaint is really to assert new theories of law and it’s not necessary to do that. The law is determined by the Court based on the facts.
L,MR. VINCENZO:
But there’s also one to add claims by PHI for $150,000.00, which only came *975 out with evaluation which has not been contested.
THE COURT:
Well, if it was filed 10 days before trial and we discussed it, I’m going to grant it. We certainly, by implication, tried the issue. Of course, that raises the issue as to whether issue was joined. MR. NORWOOD:
Well, I don’t think it has been, Your Honor, but it is true that we tried the case by consent. It is true that the issues regarding PHI’s claim are, in fact, identical to the underwriters. And it is true that at Counsel’s request we stipulated to the evaluation of property damage. [Emphasis added.]
MR. CUNNINGHAM:
Actually, no. The stipulation was as to the insurance payment. The evaluation, which is in evidence, — and that’s part of the basis for the amended claim. The insurance company paid 2.55 million, the expert report said the value of the helicopter before the crash was 2.77 million. Upon receiving that on July 27th, we immediately filed an amended complaint asking for another $150,000.00 to be awarded to PHI.
MR. NORWOOD:
Your Honor, we did not object to the entry of the evaluation and we have no counter evaluation. So I don’t understand what the issue is. [Emphasis added.]
THE COURT:
There is no issue.
MR. CUNNINGHAM:
I just want to make sure that the Motion for Leave is granted and it’s considered a likelihood.
[ i ,THE COURT:
It will be.
The record reflects that PHI had operated the helicopter for more than fourteen years at the time of the accident. The tail rotor blades that were on the subject helicopter on August 19, 2004, were purchased by PHI in February of 2000 and originally put into service shortly afterward on a different helicopter from the one that is the subject of this appeal. Shortly before August 19, 2004 accident, the tail rotor blades were in use on another PHI helicopter that was destroyed by a lightning strike while on the runway. PHI’s mechanics removed them from that helicopter, and on November 20, 2003, installed them on the helicopter involved in the instant case.
Bell does not contend that the removal of the blade from another helicopter and its installation on the helicopter that is the subject of this litigation voided whatever warranties, if any, that may have existed regarding the blade,
PHI contends that the evidence at trial established that the Helicopter’s tail rotor assembly failed because one of the tail rotor blades separated in flight, causing a catastrophic imbalance in the tail rotor system.
PHI claims that an undetected fatigue crack in one of these rotor blades caused this incident and that the fatigue crack was attributable to latent defects of which Bell was aware or should have been aware at the time of purchase, i.e., the loss of the helicopter was due to a redhibitory vice.
Bell argues that none of the parts of the helicopter that were recovered show any sign of fretting or fatigue. The tail rotor blades themselves were never recovered.
115In a redhibitory action the plaintiff must prove by a preponderance of the evidence that the item sold contained a hidden defect before the sale which was not apparent by ordinary inspection and *976 which rendered the thing unfit for its intended use or so imperfect that the purchaser would not have bought it had he known of the defect. Prat v. Heymann, 410 So.2d 343, 346 (La.App. 4 Cir.1982). The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time. La. C.C. art. 2530. As the defect in the instant case did not appear within three days of delivery, there is no presumption that it existed at the time of delivery. Therefore, the burden is on PHI to prove the existence of the defect at the time of delivery.
Bell cites Moreno’s Inc. v. Lake Charles Catholic High Schools, Inc., 315 So.2d 660, 662 (La.1975) for the proposition that a plaintiff may prove the existence of a defect at the time of sale by either direct or indirect evidence.
Bell, as the manufacturer and seller of the tail rotor blades, is deemed as a matter of law to know of any redhibitory defect. La. C.C. art. 2545. As a manufacturer and seller deemed as a matter of law to have knowledge of any redhibitory vices, Bell is liable for any damages occasioned by the redhibitory vice.
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees....

Id.

|! ^Therefore, we find that the trial court, having found that a redhibitory vice existed, did not err in making the awards to PHI that it made. The trial court judgment, which included reasons for judgment within its judgment, found that:
This Court finds that the sole cause of the in-flight failure of the tail rotor assembly, leading to the forced landing and subsequent loss of the Bell Model 412 Helicopter, Serial Number 36005, Registration Number N22347 (the “Helicopter”) on August 19, 2004 was a redhi-bitory defect or vice in design and construction of the tail rotor blades of the Helicopter manufactured and sold by Bell and installed on the Helicopter. The Court further finds that PHI’s inspection and safety procedures and its operation of the Helicopter at all pertinent times were, in all respects, proper and reasonable and that PHI was without fault in connection with the in-flight failure of the tail rotor assembly, forced landing, loss of the Helicopter and injuries, if any, sustained by the passengers and crew.”
The trial court’s findings of fact are subject to manifest error review and are only reversible by this Court if found to be clearly wrong. This applies to the trial court’s finding incorporated into its judgment of “a redhibitory defect or vice in design and construction of the tail rotor blades of the Helicopter manufactured and sold by Bell and installed on the Helicopter.” The trial court also found that “PHI’s inspection and safety procedures and its operation of the Helicopter at all pertinent times were, in all respects, proper and reasonable and that PHI was without fault in connection with the in-flight failure of the tail rotor assembly ...” We find no evidence in the record to contradict this latter finding.
PHI presented evidence of failure of other such Bell tail rotor blades. Dr. Roch Shipley was qualified by the trial court as PHI’s expert professional engineer with expertise in failure analysis. *977 His testimony supports the conclusion of the trial court concerning the failure of the tail rotor blade. After discussing a num-berjjjof possibilities he concluded that the failure that result in the forced landing of the helicopter in the water occurred in the tail rotor blade:
Just to cut to the chase, what conclusion I came to was that all of the evidence was consistent with the idea of losing a portion of a blade. And this is an area where there have been problems in the past. So if we lose a portion of the blade — the force is 16,000 pounds. If we lose a portion of the blade, let’s say 8,000 pounds, just and odd number— 8,000 pounds is roughly the weight of a fully loaded Chevy Suburban or whatever your favorite car or truck — if it’s a smaller car, may be two of them.
* * * *
So I’m pulling with 8,000 pounds and what’s happened is I’m twisting this mounting around causing the distortion of the studs, causing the distortion that we saw in the holes.... But we come around, we’ve distorted the fin, we do this cranking and then it comes around, lifts up the gearbox and the gearbox separates and departs the aircraft.
Dr. Shipley went on to testify that there was no distortion in certain gear teeth, indicating that there was no evidence of sudden stoppage or abnormal loading of the blade as the cause of the helicopter failure. Had that been the case there would be evidence of deformation of the drive shaft, of the “curvic coupling teeth” and of the gear, but there was no evidence of any of these. Dr. Shipley then testified that the way certain bolts were bent indicated that the entire gear box was rotated on its mounting in one direction, consistent with a large instantaneous overload, but inconsistent with a failure of the gear box itself. Again, this is consistent with failure of the tail rotor blade by separation of a portion of the blade. Dr. Shipley testified that once the separation occurred in the blade, it only had to rotate once or twice to cause the failure resulting in the loss of the helicopter — in other words, the failure would have been virtually instantaneous.
| lsDr. Shipley expressed his opinion about the most likely cause of the failure of the blade:
My opinion is that there was a crack in the tail rotor blade, and that crack progressed. That crack was undetectable during the normal daily inspections, as well as other inspections. It was undetectable and it grew to a critical length and on August 19th a portion of the tail rotor blade separated from the tail rotor assembly creating an imbalance which caused the loss of the entire trail rotor assembly through the fracturing of the tail rotor gearbox.
It was Dr. Shipley’s opinion that the crack would have been a fatigue crack, most likely caused by some internal corrosion and undetectable to the human eye. He also testified that the most likely cause of the blade failure was an internal defect that existed at the time of manufacture. Contributing to Dr. Shipley’s opinion was the fact that PHI’s daily inspections of the blades exceeded Bell’s specifications. Dr. Shipley also testified to a number of other factors supporting the conclusion that the defect was a manufacturing imperfection that resulted in the initiation and propagation of a fatigue crack, “something that made this blade different.”
Among Bell’s arguments in brief is the following:
The blades performed without incident on two different helicopters, for about 51 months and 3,380 flight hours. No problem existed at the time of delivery could have possibly remained hidden for *978 that amount of use, through the vigorous inspections, re-qualifications, and multiple overhauls.
While this argument sounds very persuasive, evidence in the record permits the trial court’s implicit finding to the contrary. During the course of Dr. Shipley’s testimony, it came out that Bell’s published performance standards in terms of life for the blade was 5,000 hours and that a blade without defect could actually | ^perform for “several hundred thousand hours.” Dr. Shipley characterized the blades as having failed to meet Bell’s performance standards and that it would have been both technically and economically practical to have manufactured the blade using a process that would not have failed. Dr. Shipley also concluded that the likelihood of a crash outweighed any burdens on Bell to adopt an alternative design for the blade.
During the cross-examination of Dr. Shipley it was revealed that there had been another blade failure in which Bell’s own investigation characterized the failure as one arising out of the manufacturing process.
Based on this Court’s review of the evidence and testimony in the record, we cannot say that the trial court committed manifest error in finding that a redhibitory defect existed in the tail rotor blade at the time it was sold to PHI, and that that defect was the cause of the loss of the helicopter.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. This Court's decision is limited to indefinite purchases made in the indefinite future. We express no opinion at this time regarding the effectiveness of a waiver of warranty for a specified purchase to be made in a more clearly defined future.

. Emphasis added.