GASKINS, J.
[¡The defendant, Scott Equipment Company, LLC (“Scott”), appeals from a trial court decision granting the plaintiff, Carter Enterprises, LLC (“Carter”), rescission of the sale of a scrap handler purchased from the defendant together with an award of attorney fees and court costs. Scott was given a credit for the value of the use, and Carter was ordered to return the scrap handler to the defendant. Scott also appeals the trial court grant of a post-trial motion for summary judgment dismissing its claim against Carter for the cost of engine repairs on the scrap handler. For the following reasons, we affirm in part and reverse in part the trial court judgment and remand for further proceedings.
FACTS
Barry Carter, the owner of Carter, had been involved in the logging business for many years and had purchased equipment from Scott in the past. Mr. Carter went into the scrap metal business and formed a new company, Top Dollar Scrap & Recover, LLC (“Top Dollar”). He talked with Burton Schieffler, a salesman with Scott, about the need for a scrap handler machine. Mr. Schieffler told Mr. Carter about a Volvo excavator that Scott had purchased from Volvo in 2006 and had previously rented to another company for 15 months for use as an excavator. He informed Mr. Carter that the excavator could be converted to a scrap handler. Scott purchased a cab, boom, grapple, and magnet from other suppliers and installed them on the excavator, converting it into a scrap handler. This work took several months.
li>Mr. Carter purchased the machine from Scott for $273,457.87, plus tax.[1] The machine was delivered to Mr. Carter’s scrap yard in Homer, Louisiana, on April 10, 2008. Problems developed with the scrap handler almost immediately. The machine felt unstable to operators and sometimes the tracks came off. The pins on the grapple frequently broke, the air conditioning in the cab did not work properly, the turn motor to the grapple blew seals and lost hydraulic fluid. There were electrical problems affecting the generator and magnet. The machine developed difficulties with the engine which eventually necessitated its replacement. Scott came out to the scrap yard on numerous occasions to fix the machine, but the problems persisted. According to Carter, the scrap handler is still not usable. Carter would have used the machine approximately 300 hours per month. However, during the first six months Carter had the machine, it was only usable for about seven hours per month. Eventually, Scott refused to continue servicing the machine.
On June 15, 2009, Carter filed suit against Scott and Volvo Construction Equipment North America, Inc., claiming that the scrap handler had redhibitory vices and demanding a return of the purchase price, attorney fees, and all other necessary and equitable relief. Carter al *1137 leged that Scott and Volvo knew or should have known that the equipment was defective at the time of delivery and sale.[2]
IsScott filed a reconventional demand against Carter and a third-party demand against Top Dollar, asserting that Carter owed $56,340.37 for replacement of the engine in the machine. Scott also sought to recover on the promissory note given in connection with the purchase of the scrap handler.
Volvo filed a motion for summary judgment, claiming among other things that the plaintiff had no proof of any claim against Volvo for redhibition. Volvo asserted that any defects in the machine were caused by the intervening act of a third party. Scott also filed a motion for summary judgment, seeking to dismiss Carter’s claim for recovery on the engine, turbocharger, and track malfunctions as well as the claims regarding the configuration and specification of the component parts used in the conversion process. Scott argued that there was no showing that there were any defects in the engine, turbocharger, or tracks when the excavator was delivered to Scott from Volvo in 2006.
On September 9, 2010, the trial court held a hearing on various exceptions and motions filed by the parties. The trial court granted in part Volvo’s motion for summary judgment dismissing with prejudice all redhibition claims arising out of or relating to the conversion of the machine, reserving any rights that might exist against Volvo in warranty. The trial court bifurcated the issue of Scott’s reconven-tional and third-party demand and reserved to Carter and to Scott the right to bring a claim in warranty regarding the repair cost of $56,340.37 for the replacement of the engine in 2009. Volvo reserved any objections, defenses, and limitations to any claim |4for warranty. Scott’s motion for summary judgment seeking to dismiss Carter’s claim for recovery on the engine, turbocharger, and track malfunctions was denied.
Trial on the merits was held on October 12,13, and 14, 2010. On January 31, 2011, the trial court signed and filed a judgment in favor of Carter and against Scott, finding that the machine had redhibitory defects and ordering the rescission of the sale of the scrap handler. Scott was ordered to pay Carter $320,094.60, together with attorney fees, court costs, and interest and Carter was ordered to return the scrap handler to Scott. Scott was given a credit for the use of the machine by Carter in the amount of $17,366.
The trial court filed written reasons for judgment. The court found that the excavator originally purchased by Scott was converted by that company into a scrap handler. Scott ordered component parts from various manufacturers including a cab, boom, large counterweight, and a grapple magnet assembly. Scott installed the parts, converting the excavator into a scrap handler. The retrofitting took two months and the converted scrap handler was delivered to Mr. Carter’s scrap yard. Calvin Allen, a heavy equipment operator with Carter and the main operator of the scrap handler, began experiencing problems with the machine immediately. The pins in the grapple assembly broke, causing it to disconnect from the scrap handler. The turn motor in the-grapple was not *1138 working properly and began leaking. The air conditioner in the- cab malfunctioned. Technicians from Scott were dispatched to address the problems with the scrap handler. Scott technicians | Stestified that Scott over-pressurized the hydraulic system during the conversion process.
The trial court found that within the first six months after delivery, Scott made 20 service calls to the plaintiffs scrap yard. Cost of repairs made during that time was $17,371.02. It does -not appear that Carter was actually billed for this amount. The repairs did not resolve the problems. The scrap handler was used for only 46 hours in the first six months after delivery to the plaintiff.
In its opinion, the trial court observed that in April 2009, approximately one year after the delivery of the machine, the engine lost pressure and started smoking. Mr. Carter bought a new turbocharger from Scott and had it installed on the machine. This did not alleviate the problem and the engine had to be replaced. The. engine was not replaced until May 29, 2009. The court noted that Mr. .Carter stopped using the scrap handler for a period of time and stopped paying the note on the machine, hoping that Volvo would take it back. When Volvo refused to take the machine back, the plaintiff brought the note current and put the machine back into use. It began consuming huge quantities of oil, using 55 gallons over a four-day period. Scott refused to make any more repairs on the machine and Mr. Carter began using it less.
The hour meter on the machine showed that, prior to the sale to Carter and while it was being leased as an excavator, it was used for 1,002 hours over a 15-month period. The court found that this amounted to use for 66.8 hours per month. After it was sold to the plaintiff, it was used an average of | (¡7.67 hours per month. The hour meter eventually stopped working, as did the VCAD (Volvo Computer Aided Diagnostic) system on the machine which would have recorded the time the machine was used. The court found that the scrap handler still has problems with the cab’s air conditioning, the pins in the grapple mechanism, weak power in the magnet, and abnormal hydraulic leaks. The - engine operates at only one speed, the engine lacks power, the tracks pop off when the cab is perpendicular to them and the boom is extended, and the cab is top-heavy and unsteady.
The trial court discounted Scott’s claim that the problems with the scrap handler were caused by operator misuse and lack of proper maintenance. The court found that, with almost 30 service reports generated by Scott in the first six months the machine was in the possession of Carter, none of the reports show that the problems were caused by Carter or its employees. One of the reports filled out by a Scott technician showed that the machine was a “lemon” and “haunted.” The record also showed that the machine was regularly and properly maintained.
According to the trial court, Carter claimed that the machine had redhibitory defects that existed at the time Carter purchased it, and that Scott breached its implied warranty by selling a scrap handler that was not fit for the intended purpose. The court found that Carter proved that Scott had reason to know the particular use that Carter intended for the thing or Carter’s purpose for buying the thing and that Carter relied on Scott’s skill or judgment in selecting it. The court also determined that the problems with the scrap handler were apparent on the date of delivery and continued | thereafter until present, despite Scott’s attempts to correct the problems. The trial court stated that Carter proved that the scrap handler was so useless and its use so inconvenient that *1139 Carter would never have bought it had it known of the defects.
The court determined that the problems with the machine were the result of Scott’s conversion, not as a result of Volvo’s manufacture of the excavator. The trial court found, that because of the conversion work done by Scott, it was the manufacturer of the scrap handler and was deemed to know that the machine had a redhibitory defect.
The court ruled that the sale be rescinded and that Scott was liable to Carter for the return of the purchase price with interest, for reimbursement of reasonable expenses occasioned by the sale and incurred for the preservation of the machine, and for damages and attorney fees. However, the court reduced the amount to be paid by Scott by the value of Carter’s use of the machine. The court determined that this amount was $17,366.
Carter requested that attorney fees be awarded in the amount of its contract fixed with its attorney, 40 percent of any amount recovered in the lawsuit. The tidal court found that calculating the attorney fees in this manner would result in an award that appeared to be inordinately high. The trial court stated that the amount of the attorney fee award would be based on the submission by the plaintiffs attorney of an affidavit showing hourly rates and the amoünt of work done in this matter.
Carter filed several post-trial motions. These included a motion for new trial for the limited purpose of quantifying the plaintiffs attorney fees |sand a motion to tax the costs of a deposition. Carter also filed a motion for summary judgment on Scott’s reeonventional demand against Carter and third-party demand against Top Dollar, seeking to recover for the cost of repairs to the engine in the amount of $56,340.37.
A hearing was held' on March 14, 2011, on the plaintiffs motion to tax costs and the motion for summary judgment. The trial court awarded costs to Carter and granted summary judgment in favor of Carter and against Scott, dismissing Scott’s claim to recover for the cost of engine repairs.[3]
An evidentiary hearing was scheduled for April 7, 2011, on the issue, of attorney fees. Carter’s counsel appeared before the court and it was agreed that the parties waived their appearance and submitted the matter on the basis of the suit record and the evidentiary submissions of each party. Carter’s counsel filed an affidavit requesting $90,000 in attorney fees. The transcript reflects that the trial court signed the final judgment at that time, awarding that amount in attorney fees. Scott appealed from the trial court judgment.
REDHIBITION, RESCISSION OR REDUCTION, AND CREDIT FOR USE
Scott essentially argues that the trial court erred in finding that the scrap handler had redhibitory defects. Scott further contends that, if the scrap handler had redhibitory defects, they warranted only a reduction in the price and not a rescission of the sale. Scott urges that it should have received 19a greater credit for the value of the use of the machine. These arguments are without merit.
*1140 Legal Principies
A seller warrants the buyer against red-hibitory defects, or vices, in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed the buyer would not have bought the thing if he had known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. La. C.C. art. 2520. The seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things. La. C.C. art. 2521.
The thing sold must be reasonably fit for its ordinary use. When the seller has reason to know the particular use the buyer intends for the thing, or the buyer’s particular purpose for buying the thing, and that the buyer is relying on the seller’s skill or judgment in selecting it, the thing sold must be fit for the buyer’s intended use or for his particular purpose. If the thing is not so fit, the buyer’s rights are governed by the general rules of conventional obligations. La. C.C. art. 2524.
La. C.C. art. 2530 provides that if the vice has made its appearance within three days immediately following the sale, it is presumed to have existed before the sale. In all sales transactions, the seller impliedly warrants that the thing sold is free of redhibitory defects and is reasonably fit for its intended purpose. Gaston v. Bobby Johnson Equipment Company, Inc., 34,-028 (La.App.2d Cir.11/3/00), 771 So.2d 848.
| ¶Although this warranty does not apply as extensively as with new products, it requires that even used equipment operate reasonably well for a reasonable period of time. Gaston v. Bobby Johnson Equipment Company, Inc., supra; Ross v. Premier Imports, 96-2577 (La.App. 1st Cir.11/7/97), 704 So.2d 17, unit denied, 97-3035 (La.2/13/98), 709 So.2d 750; Crow v. Laurie, 98-0648 (La.App. 1st Cir.2/19/99), 729 So.2d 703.
The existence of a redhibitory defect is a question of fact which should not be disturbed in the absence of manifest error or abuse of the factfinder’s wide discretion. Ford Motor Credit v. Laing, 30,160 (La.App.2d Cir.1/21/98), 705 So.2d 1283; Gaston v. Bobby Johnson Equipment Company, Inc., supra; Rodriguez v. Chrysler Group LLC, 2011-524 (La.App. 3d Cir.11/2/11), 76 So.3d 1279. Consequently, an appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Rodriguez v. Chrysler Group LLC, supra. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Discussion
Scott claims that the plaintiff provided the specifications and requirements for the machine such as the cab height, boom length, and size of the grapple and magnet. These items were purchased from various Inmanufacturers and installed on the excavator to convert it into a scrap handler. Scott maintains that the work it did on the machine was limited and did not constitute a major modification of the equipment. Specifically, Scott points out that no modifications were done to the track system, solenoid, hydraulic pump, or the engine, all areas that Carter has asserted have defects. Scott claims that all the modifications were done correctly and *1141 the machine was properly configured. It argues that representatives from Carter inspected the modifications throughout the process. Scott denies that the machine was unstable.
Scott claims that the problems with the machine were not redhibitory, but if they were, they justified a reduction in the price and not a rescission of the sale. While there were initially problems with the air conditioner, grapple motor, and magnet, Scott claims that all of these were remedied within a few weeks or months of delivery of the machine. Scott contends that the engine failure was due to normal wear and tear and due to the improper installation of a turbocharger. Further, Scott claims that Carter used the machine at least three to five hours per day and therefore, Scott should have been awarded a greater credit for use of the machine.
The record shows that Barry Carter, owner of the plaintiff company, went to Scott and enlisted its aid in finding a scrap handler. Scott was aware of the purpose of the machine and the use for which it was intended. Scott owned the excavator used here and proposed modifications to convert it to a scrap handler. The conversion of the machine took several months and problems with the machine surfaced almost immediately after delivery. Mr. 112Carter testified that the pins in the grapple broke and that this problem is still occurring. The air conditioner did not work properly. The turn motor on the grapple would blow seals and lose hydraulic fluid. Mr. Carter said that Scott over-pressurized the hydraulic system and that the turn motor is still leaking. The magnet had low voltage and Scott’s technician determined that electrical wires leading to the magnet had been improperly spliced.
Mr. Carter testified that he was only able to use the machine for approximately seven hours per month during the first six months he had the machine. If it had been fully operational, he claims that he would have used it 300 hours per month. The hour meter and another device for measuring the amount of use of the equipment ceased to function.
Mr. Carter said that 20 service calls were placed to Scott during the six months after the machine was delivered to Carter. According to Mr. Carter, none of the technicians from Scott ever indicated that Carter or its employees were misusing or abusing the machine or failing to maintain it properly. Mr. Cater testified that he saw the tracks off the machine at one time.
John Thomas Kuster, a former employee of Scott, testified as an expert in diesel mechanics, hydraulic systems, diagnosis, repair, and servicing of heavy lifting equipment, including the use, operations and capacities of that equipment. He stated that he worked on the machine on a number of occasions. He said that the hydraulic system was over-pressurized during the conversion process, causing problems with the turn motor on the grapple. After repairs, hydraulic leaks continued. Mr. Kus-ter testified that the air conditioning failed because particles used for sandblasting during the | ^modification process got into the system. Mr. Kuster acknowledged that there was low electrical voltage to the magnet which limited the use of the machine. This was caused by multiple splices made to the electrical wiring during the conversion process. After several attempts, the wiring was repaired.
Mr. Kuster stated that he became frustrated with the machine and on one repair form dealing with the cause of the problem, he inserted two boxes of his own and labeled them “lemon” and “haunted.” He testified that the machine was not fit for its intended use as a scrap handler. Mr. Kuster also stated that the machine was not stable. He testified that there was no *1142 indication that Carter caused any of the problems.
Calvin Allen, the equipment operator for Carter, testified that the machine swayed and felt unstable. He acknowledged that after using the machine, he became used to the movement. He stated that pins holding the grapple motor in place began to break almost immediately. Problems with the turn motor persist. There were extensive problems with the air conditioner and, according to Mr. Allen, it still does not work satisfactorily.
Mr. Allen said that the magnet has low power and will not pick up much. He claimed that the cable going to the generator caught on fire. Mr. Allen testified that the machine uses large amounts of hydraulic fluid. He also stated that the tracks came off the machine.
Burton Schieffler, the salesman for Scott who sold the scrap handler to Carter, stated that converting equipment is often done in the industry. He said that Carter relied on him to come up with the specifications for the |umachine. He denied that the machine was unsteady. He agreed that there was no showing that Carter abused the scrap handler. Mr. Schieffler testified that with the degree of conversion done in this case, he did not think that 20 service calls in the first six months after delivery was excessive.
Rene Sanchez, a former employee of Scott, testified as an expert in the same areas as Mr. Kuster. He said that he worked on the conversion of the machine. He denied that the machine was unsteady. He stated that it was necessary to splice some of the wiring used in the conversion.
Richard Adams, an employee of Scott, testified as an expert and stated that he worked on the scrap handler and denied that it was unstable. He repaired a hydraulic leak to the grapple, fixed the turn motor and corrected an over-pressurization. He did not feel that there were serious mechanical problems with the scrap handler.
Matthew Michael Murphy, a field service technician with Scott, testified as an expert. He examined the machine at Carter’s scrap yard in February 2010. The machine was in use when he arrived and he stated that it seemed to be working fine.
In this matter, there was extensive testimony and evidence concerning the conversion of the Volvo excavator into a scrap handler, its sale to Carter, and the problems that arose after the conversion. While Scott denied the existence of redhi-bitory defects, the record shows that the machine underwent an extensive conversion, done by Scott, and that Scott’s personnel were integral in configuring the machine, finding necessary parts and installing those components. The scrap handler had problems almost | ^immediately upon delivery including broken pins in the grapple, air-conditioning problems, hydraulic leaks, low voltage to the magnet, problems with the tracks, and complaints of instability. There was testimony that these problems were persistent and prevented Carter from being able to depend upon the machine for its intended use and purpose as a scrap handler.
The trial court made a credibility determination in this case and concluded that the scrap handler had redhibitory defects. The trial court did not err in concluding that the defects warranted a rescission of the purchase price.
Scott argues that it should have been given a larger credit for Carter’s use of the scrap handler. It cites deposition testimony of Mr. Carter that the plaintiff used the scrap handler three to five hours per day up until the installation of the second engine. At that point, Carter made *1143 a decision not to use the machine. Scott contends this decision was not because of operational problems. Scott also points out that on several occasions when its technicians went to the scrap yard to service the machine, they had to wait for the operator to finish using it. Scott also claims that the service records show that on most occasions, there was no mechanical reason for the scrap handler not to be operating and it was operational and able to perform.
The trial court also made a credibility determination on this issue. Although Scott argues that the machine was used extensively by Carter, the record shows that it was used for only a few hours per month due to the extensive defects. The very devices used for measuring the amount of use on this machine failed. The trial court’s finding as to the amount of time the |1fimachine was actually used was based upon testimony in the record. The trial court’s finding of fact in this regard is not manifestly erroneous or clearly ■wrong.
MANUFACTURER AND ATTORNEY FEES
Scott argues that, if Carter is entitled to rescission, it is not entitled to attorney fees. Scott contends that it is not the manufacturer of the original piece of equipment. It maintains that the modifications to the machine were not a significant conversion. Scott urges that the core components of the unit were not converted or modified. This argument is without merit.
Legal Principles
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits. A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing. La. C.C. art. 2545. See also Tucker v. Petroleum Helicopters, Inc., 2008-1019 (La.App. 4th Cir.3/23/09), 9 So.3d 966, writ denied, 2009-0901 (La.6/19/09), 10 So.3d 736.
Where a retailer sells and, as a part of the sale, installs a thing, and that installation is defective, the seller is held to the same standard as a | ^manufacturer and is presumed to know of the defect in the installation. Credeur v. Champion Homes of Boaz, Inc., 2008-1096 (La.App. 3d Cir.3/4/09) 6 So.3d 339, writ denied, 2009-1099 (La.9/4/09), 17 So.3d 965. A “manufacturer” is defined in La. R.S. 9:2800.53 which provides in pertinent part:
(1) “Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. “Manufacturing a product” means producing, making, fabricating, constructing, designing, re-manufacturing, reconditioning or refurbishing a product. “Manufacturer” also means:
(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(c) A manufacturer of a product who incorporates into the product a compo *1144 nent or part manufactured by another manufacturer.
[[Image here]]
In a redhibition action, reasonable attorney fees are awarded to justly compensate plaintiffs who succeed in establishing liability on the part of a bad faith seller under La. C.C. art. 2545. A manufacturer is conclusively presumed to have knowledge of defects in the object it produces. Since the manufacturer’s knowledge is conclusively presumed, the manufacturer is deemed to be in bad faith in selling a defective product and is liable to the buyer for damages and attorney fees, in addition to the purchase price and expenses occasioned by the sale. Gaston v. Bobby Johnson Equipment Company, Inc. supra.
11sWhile the trial court has great discretion in awarding attorney fees in a redhibition case, such an award must be reasonable, based upon the degree of skill and work involved in the case, the number of court appearances, depositions, and the office work involved. Ollis v. Miller, 39,-087 (La.App.2d Cir.10/29/04), 886 So.2d 1199.
Scott contends that it is a seller in good faith and not a manufacturer and should not be liable for attorney fees. If an attorney fee is awarded, Scott claims that the award is excessive because much of the time of Carter’s attorney was spent pursuing the claim against Volvo.[4]
Discussion
In this matter, the record shows that Carter informed Scott that it was seeking a scrap handler. Scott owned the Volvo excavator and proposed a conversion of the machine to a scrap handler. The cab, boom, magnet, and grapple were purchased by Scott from various suppliers and were installed by Scott onto the machine. The conversion took approximately two months. These facts support the trial court’s finding that Scott was a manufacturer of the scrap handler, that the machine had redhibitory defects, and that Scott was liable to Garter for attorney fees.
Carter’s attorneys submitted an affidavit showing that four attorneys and a paralegal from the law firm worked on the case. The affidavit outlined the rates and the number of hours worked. The attorneys pointed out that the | i3case involved 10 depositions, multiple hearings, and a three-day bench trial. The attorney fees totaled $90,579.50. At the hearing to set the attorney fees, one of Carter’s attorneys stated:
[PLAINTIFF’S ATTORNEY]: Your Honor, my affidavit has $90,000 in legal fees, and as my affidavit makes out, we had multiple depositions and multiple things going on in that case and also a three day trial....
COURT: $90,000.00?
[PLAINTIFF’S ATTORNEY]: Yes, Ma’am....
COURT: I have signed the judgment. The amount is $90,000.00.
In this matter, there is no showing that this fee is excessive. The trial court award is affirmed.
*1145 ENGINE REPAIR
Scott asserts that the trial court erred in granting summary judgment in favor of Carter, finding that Scott is not entitled to reimbursement for the cost of the replacement engine. According to Scott, this repair was necessitated by the negligent installation of a turbocharger by Carter, not because of a redhibitory defect existing at the time of the sale. This argument has merit.
Legal Principles
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880; Amos v. Crouch, 46,456 (La.App.2d Cir.6/29/11), 71 So.3d 1053.
| ggAppellate courts review summary judgments de novo, under the same criteria that govern a district court’s consideration of whether summary judgment is appropriate. Jenkins v. Willis Knighton Medical Center, 43,254 (La.App.2d Cir.6/4/08), 986 So.2d 247. A court must grant a motion for summary judgment “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B). A fact is material if its existence or nonexistence may be essential to the plaintiff’s cause of action under the applicable theory of recovery. Amos v. Crouch, supra.
Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of actions. La. C.C.P. art. 966(A)(2); Jenkins v. Willis Knighton Medical Center, supra. The party opposing summary judgment cannot rest on the mere allegations or denials in his pleadings, but must show that he has evidence which, if believed, could satisfy his evidentiary burden of proof at trial. If he has no such evidence, then there is no genuine issue of material fact, and the movant is entitled to summary judgment. La. C.C.P. art. 966(C)(2); Jenkins v. Willis Knighton Medical Center, supra.
The moving party bears the burden of proof. However, when he will not bear the burden of proof at trial on the matter before the court on summary judgment, the movant is not required to negate all essential elements of the adverse party’s claim; he need only point out an absence of factual support for one or more essential elements of the adverse party’s | ⅞, claim. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact and summary judgment is appropriate. La. C.C.P. art. 966(C)(2). Russell v. Eye Associates of Northeast Louisiana, 46,525 (La.App.2d Cir.9/21/11), 74 So.3d 230.
Discussion
Scott filed a reconventional demand against Carter alleging that in May 2009, Scott placed an engine in the scrap handler at a cost of $56,340.37, and that Carter had not paid for the engine. This issue was bifurcated from the issue of redhibi-tory defects. However, at the trial on the main demand, the trial court heard some testimony concerning the failure of the engine in the scrap handler and its replacement.
Mr. Carter testified at trial that on April 22, 2009, the engine “ran away” and he thought the turbocharger was bad. He took the turbocharger off the scrap handler and took it to Scott. An employee there confirmed that the turbocharger *1146 was bad. He purchased a new turbocharger from Scott and was instructed to be sure all the pieces of the old turbocharger were cleaned out of the engine before starting it up with the new turbocharger. He stated that his diesel mechanic, Dennis Dance, looked for the missing pieces, but found none. However, after Mr. Dance installed the new turbocharger, the engine worked for a few minutes and was shut down. When the engine was started up again, it failed. Scott replaced the engine. Mr. Carter stated that originally Scott indicated that the engine replacement was covered by the |22warranty with Volvo. However, after Carter filed its suit, for redhibition, Scott filed a claim against Carter for the cost of the engine replacement.
Mr. Dance testified that he replaced the turbocharger on the scrap handler. He said that the impeller had come apart inside the turbocharger. He was concerned because he could not find all the pieces to the impeller. He said that he blew everything out and looked everywhere, but could not find the missing pieces of the impeller. He called Scott and inquired about where to look for the pieces. After he replaced the turbocharger, the engine idled for 10 to 15 minutes and then he shut it off. After he left, employees at Carter started the machine again and the engine failed.
Richard Adams, a Scott employee, testified that he did some repairs on the scrap handler. Mr. Adams said that Scott was informed that Carter’s mechanic had replaced the turbocharger on the machine and that it would not run. According to Mr. Adams, the turbocharger was not properly connected and metal and oil had gotten on a piston and locked up the engine. Mr. Adams testified that the turbocharger was connected with only two bolts when there should have been four. He stated that Mr. Allen told him that when the turbocharger was being installed, there was a fire near the machine, so the scrap handler was cranked up and moved about 40 feet.
Mr. Adams replaced the engine. He testified that he was not aware of any complaints with the new engine after it was installed. However, he was shown a service report where an oil leak in the new engine was repaired by Scott.
laaOn February 22, 2011, after the trial court rendered judgment on the main demand, finding that the scrap handler had redhibitory vices, Carter filed a post-trial motion for summary judgment seeking to dismiss Scott’s reconventional demand against Carter and third party demand against Top Dollar Scrap & Recovery, LLC, for recovery of the cost of the engine replacement. Carter argued that the trial court’s ruling that the scrap handler was redhibitory was “law of the case.” Because the trial court had already found that the machine was redhibitory and that Scott was responsible for expenses incurred in connection with it, Carter should not be liable for the cost associated with the replacement of the engine in the scrap handler.
A hearing was held on several issues including Carter’s motion for summary judgment to dismiss Scott’s claim for the cost of replacing the engine. Carter argued that, because the trial court ruled that the entire machine had redhibitory defects necessitating rescission of the sale, it would be incongruous to hold open for further consideration whether and to what extent Carter should have to bear the expenses associated with replacing the engine. According to Carter, the principles of redhibition allow for recovery not only of the cost of the sale, but all expenses related thereto. Carter did not pay the cost of the engine replacement because *1147 there was a dispute as to whether the engine was under warranty. Carter claimed that, where the entire machine has been declared redhibitory, it would violate the principles of redhibition and the law of the case doctrine to require Carter to pay the cost of replacing the engine in a redhi-bitory machine.
[ 24Scott argued that there were no problems with the original engine until after it had been in service for one year at Carter’s scrap yard. Scott contended that the engine was not redhibitory, and that the damage to the engine which required its replacement was caused by Carter’s mechanic incorrectly installing a turbocharger. Scott claimed that there is a genuine issue of material fact as to whether there was any defect in the engine at the time of delivery of the machine. Scott also pointed out that it did not modify the engine in any way during the conversion process.
The trial court granted Carter’s motion for summary judgment, dismissing Scott’s claim to recover the cost of replacing the engine. According to the trial court, it should have stated in the judgment that all claims not considered were denied. The trial court noted that in formulating its reasons for judgment, it never gave much thought to the engine problems because it intended to declare the entire machine to be redhibitory instead of considering “parts and bits of it.” The trial court stated that it was not going to parse out the engine from the rest of the machine. Therefore, the claim by Scott seeking to recover the cost of replacing the engine was denied. Any claims that Scott may have against Volvo arising out of the engine failure were reserved to Scott. Scott urges on appeal that the trial court erred in granting the motion for summary judgment in favor of Carter on this issue.
Carter argued that, because the scrap handler had redhibitory vices necessitating a rescission of the sale and a return of the machine to Scott, Scott was responsible for expenses connected with the machine. La. C.C. art. 2545 provides that a bad faith seller or a manufacturer of a product with 1 Ka redhibitory vice is liable to the buyer for the return of the price with interest from the time it was paid, for reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing and also for damages and reasonable attorney fees. Expenses incurred for the preservation of the thing have been held to include towing expenses and repair bills for redhibitory vices. See Breaux v. Winnebago Industries, Inc., 282 So.2d 763 (La.App. 1st Cir. 1973). Expenses occasioned by the sale include compulsory insurance premiums for vehicles and finance charges incidental to the purchase. See Miller v. Ford Motor Company, 2001-1299 (La.App. 3d Cir.2/6/02), 815 So.2d 997, and Vance v. Emerson, 420 So.2d 1032 (La.App. 5th Cir. 1982).
There has been no showing that the engine problem was one of the many red-hibitory vices affecting the scrap handler. The engine repair cannot be considered as a reasonable expense occasioned by the sale or an expense incurred for the preservation of the thing.
Scott, as the party opposing the motion for summary judgment, showed that it had evidence which, if believed, could satisfy its evidentiary burden of proof at trial. The record shows that Scott did not alter the engine in any way during the conversion process. The engine failed quite some time after the scrap handler was delivered to Carter. In this case, the parties agreed to bifurcate the issue regarding the scrap handler. Some information is contained in the record concerning the engine, but the issue had not been fully litigated. There is some indication that the turbocharger was *1148 negligently installed by Carter’s mechanic and that action caused the engine 12fito fail. Under these circumstances, Scott has shown that there is a genuine issue of material fact as to whether the engine replacement was caused by the fault of Carter. If this fact is proven, this would be a separate issue from the redhibition claim and Carter would not be allowed to recover for an expense occasioned by its own fault. If Scott is successful in showing that the engine failure was caused by Carter’s negligence, it would be inequitable to require Scott to reimburse Carter for the entire cost of the scrap handler on the redhibition claim, and then also to bear the cost of replacing the engine.[5]
The trial court erred in finding that Carter was entitled to summary judgment. We reverse that portion of the trial court judgment and remand for further proceedings.
CONCLUSION
For the reasons stated above, we affirm that portion of the trial court judgment finding that the scrap handler sold by the defendant, Scott Equipment Company, had redhibitory vices; that the plaintiff purchaser, Carter Enterprises, was entitled to rescission of the sale; and that Scott was a manufacturer of the scrap handler, was deemed to know of its defects, and was liable to Carter for attorney fees. We reverse that portion of the trial court judgment finding that Carter was entitled to summary judgment, | ^dismissing Scott’s claims for the cost of replacement of the engine in the scrap handler. The matter is remanded to the trial court for further proceedings. Costs in this court are assessed two-thirds to Scott and one-third to Carter.
AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.
STEWART, J., concurs.

. The purchase price of the machine was $273,457.87, the sales tax was $19,483.87, the finance charge was $44,168.86, and a processing fee of $350 was included for a total amount paid of $337,460.60.

. In addition to its redhibition claim, Carter sought recovery under the Louisiana Products Liability Act ("LPLA”). This claim was dismissed pursuant to exceptions of no cause of action filed by Volvo and Scott, asserting that Carter failed to allege that personal injuries were caused as a result of an alleged unreasonably dangerous or defective condition of the machine.

. In addition, Scott claimed that when it filed its reeonventional and third-party demand against Carter in August 2009, that Carter was in default on its note. Carter eventually made the note current, but Scott sought recovery of attorney fees in connection with the collection, of the note. The trial court granted judgment in favor of Scott on this issue awarding Scott $2,119.32 in attorney fees against Carter. This issue is not before the court on appeal.

. The defendant argues that the trial court awarded $50,000 in attorney fees and that this amount is excessive. The trial court hand wrote the amount of the attorney fee award into the judgment. While the handwritten amount might at first appear to be $50,000, we have examined the trial court’s handwriting on other documents in the record and we conclude that the amount of the award is $90,000. This is consistent with the transcript which reflects that the trial court stated that attorney fees would be awarded in the amount of $90,000.

. Carter contends that the trial court's finding that the scrap handler was redhibitory and that rescission of the sale was the proper remedy is the law of the case and precludes the imposition on Carter of payment for the engine replacement.
The law of the case refers to a policy by which the court will not reconsider prior rulings in the same case. See Arceneaux v. Amstar Corporation, 2010-2329 (La.7/1/11), 66 So.3d 438. In this matter, the trial court determined, prior to trial of the issues regarding redhibition, that Scott’s reconventional demand for payment for the replacement of the engine in the scrap handler would be bifurcated. Even though some testimony regarding the failure of the engine was admitted at trial, after the decision on the redhibition claim, Scott’s reconventional demand regarding the cost of replacing the engine remained outstanding. Under these circumstances, law of the case does not apply.