McClendon, j.
LA contractor appeals a trial court judgment that rescinded an alleged settlement agreement between said contractor and an owner for whom the contractor had constructed a pipe manufacturing facility. The owner also appeals a judgment following a trial on the merits, which awarded the contractor $893,520.00 after the amounts the trial court determined the parties owed to each other were offset. For the following reasons, we affirm the judgment that rescinded the purported settlement agreement, but amend the trial. courts judgment following the trial on the merits to reflect that the owner is entitled to an award of $5,560.00 after the awards are offset.
FACTS AND PROCEDURAL HISTORY
Amitech U.S.A., Ltd. (Amitech) was created to bring certain foreign pipe-manufacturing processes (the Meyer and Flowtite processes) to North America. In 2001, Amitech hired Ron Cormier, who resided in Ohio, as a manager,[1] and it began considering locations within the United States to build a pipe manufacturing plant that would utilize the Meyer and Flowtite processes.
Richard Vanek, a former business acquaintance of Cormier, suggested that Baton Rouge, Louisiana may be an attractive location for a plant because remedial work was required on the city’s sewer systems and infrastructure, which could result in the use of Amitech’s products. Vanek also suggested that Nottingham Construction, L.L.C. (Nottingham), a general contractor with experience in municipal and industrial construction, was a contractor in Baton Rouge that could construct Amiteeh’s facilities. In February 2001 and again in April 2001, Cormier traveled to Baton Rouge to meet with Ted Hicks, who was the principal of Nottingham.[2]
In May 2001, Nottingham representatives, at Cormier’s request and Nottingham’s expense, agreed to travel to Europe to tour pipe manufacturing | .¡facilities that employed the Meyer and Flowtite processes. After returning from Europe, Not *1048 tingham submitted a proposal to Amitech, containing an estímate of costs for the construction of certain elements of the Meyer and Flowtite facilities in East Baton Rouge Parish.
In June 2001, Cormier traveled to Europe and made presentations to Amitech’s parent company, Saudi Arabian Amiantit Company (Amiantit), which owns pipe manufacturing facilities throughout the world. Cormier’s presentation reflected that “the total project cost for commissioning a North American production facility is assumed to be $26.02 million.” At the conclusion of the presentation to Amiantit, Cormier was provided with verbal authorization to proceed with the efforts to construct a pipe manufacturing facility in North America.
In November 2001, at Cormier’s request, Nottingham representatives, along with design professionals, took another trip to Europe to tour Meyer and Flowtite facilities. The representatives spent approximately one day touring a Meyer facility and one day touring a Flowtite facility. Amitech reimbursed Nottingham and the design professionals for their expenses incurred for this second trip.
Following the November 2001 trip to Europe, Nottingham and Amitech negotiated and entered into a Design-Build Contract, which was executed by the parties on February 26, 2002. The primary dispute at issue arises out of the scope of the work Nottingham was required to complete in accordance with the Design-Build Contract.
In the spring of 2003, Nottingham and Amitech reached an impasse concerning the amount due Nottingham for its work under the Design-Build Contract. As a result, the, parties engaged in a several-month-long process to resolve the claims between them, resulting in two agreements, namely a letter agreement dated June 30, 2003, and an agreement styled “Program |4Management Agreement” dated July 2, 2003.[3] Both the letter and the agreement (sometimes collectively referred to as “the settlement agreement”) were signed by Cormier in his capacity as “President” of-Amitech.
On July -31, 2003, Amitech filed the instant action against Nottingham to rescind the settlement agreement, alleging that Cormier did not possess the requisite authority to bind Amitech to the settlement agreement, Nottingham filed an answer and a reconventional demand, wherein it sought to enforce the settlement agreement. Amitech amended its petition to assert claims for breach of fiduciary duty, breach of contract, and, alternatively, rescission of the Design-Build Contract.
Prior to trial, Amitech filed a motion for partial summary judgment, seeking to dismiss Nottingham’s suit to the extent it sought enforcement of the settlement agreement. On September 19, 2008, the trial court granted Amitech’s motion and rescinded the settlement agreement. Specifically, the trial court found that Amitech had not provided written authority to Cor-mier to settle, and absent such authority, *1049 Cormier could not enter into a valid settlement agreement. Moreover, in its September 25, 2008 judgment, the trial court ordered Nottingham to return the $409,000.00 that Nottingham had received from Amitech pursuant to the purported settlement.
In response to the trial court’s grant of Amiteeh’s motion for partial summary judgment, Nottingham amended its reeon-ventional demand, asserting that in the event the settlement agreement was not enforceable, Nottingham was entitled to damages in the amount of its claims existing prior to the parties’ settlement of disputes.
A bench trial was conducted between September 29 and October 8, 2008. After trial, the court took the matter under advisement, and subsequently issued |fiits written reasons for judgment. The judgment awarded Nottingham $1,040,000.00 less an amount recoverable by Amitech of $146,480.00, resulting in a net amount awarded to Nottingham of $893,520.00.
ASSIGNMENTS OF ERROR
Nottingham has appealed to seek enforcement of the putative settlement agreement and has assigned three errors, raising the following issues for review:
(1) Whether, in the absence of written evidence authorizing an agent to enter into a settlement agreement, a third party may enforce the settlement agreement against the principal based upon the theory of apparent authority?
(2) Whether, in the absence of written evidence authorizing an agent to enter into a settlement agreement, a third party may enforce the settlement agreement against the principal based upon estoppel and detrimental reliance as permitted by La. Civil Code art. 1967.
(3)Whether Nottingham demonstrated genuine issues as to material facts prohibiting Amitech from an award of summary judgment which rescinded a settlement agreement -in ■ conjunction with Issue Nos. 1 and 2.
Amitech has also appealed, assigning the following as errors:
(1) The trial court erred in finding that no fiduciary duty existed between Amitech and Nottingham.
(2) The trial court erred in failing to properly interpret the Design-Build Contract, and as a consequence further erred by finding that Amitech was not owed reimbursement for Nottingham’s failure to deliver the scope of the work contemplated by the contract price.
(3) Alternatively, the trial court erred in not rescinding the Design-Build Contract.
(4) The trial court erred in awarding Nottingham $800,000 for “Extra Fill and Site Work.”
(5) The trial court erred in awarding Nottingham $240,000 as part of an “early completion bonus.”
THE PURPORTED SETTLEMENT AGREEMENT
Nottingham has appealed to seek review of the trial court’s failure to enforce the purported settlement agreement entered into between the parties. In response, Amitech has filed a motion to dismiss Nottingham’s appeal, asserting that Nottingham waived its right to appeal the settlement issue by proceeding to trial on the post rescission demand. We disagree. The granting of |r,the motion for partial summary judgment was a partial final judgment from which no right to appeal existed absent a designation by the trial court. See LSA-C.C.P. arts. 1911 and *1050 1915.[4] We recognize that the trial court declined to designate the partial summary judgment — an interlocutory ruling — as final for purposes of an immediate appeal pursuant to LSA-C.C.P. art. 1915(B). However, after an appealable judgment is rendered in a case, the correctness of any interlocutory judgment can also be considered on appeal. Vanderbrook v. Jean, 2006-1975, p. 6 n. 4 (La.App. 1 Cir. 2/14/07), 959 So.2d 965, 968, n. 4; People of Living God v. Chantilly Corp., 251 La. 943, 947-48, 207 So.2d 752, 753 (1968). Accordingly, once the trial court signed the final judgment following the trial on the merits, Nottingham could seek review of the prior interlocutory ruling with regard to the settlement issue. Therefore, Amitech’s motion to dismiss Nottingham’s appeal is hereby denied.
Nottingham contends that the trial court, by focusing solely on whether Cormier possessed express authority to enter into the agreement, failed to consider whether Nottingham could enforce the settlement agreement against Amitech based upon the theory of apparent authority. The judicial understanding of the principles of apparent authority are analogous to the concept of putative mandatary set forth in LSA-C.C. art. 3021. See Walton Constr. Co., L.L.C. v. G.M. Horne & Co., Inc., 07-0145, p. 12 (La.App. 1 Cir. 2/20/08), 984 So.2d 827, 836. Under this theory, an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction. Walton Constr. Co., L.L.C., 07-0145 at p. 10, 984 So.2d at 835.
To support its position that a putative mandate existed, Nottingham notes that Cormier was the duly elected President of Amitech and was the only manager domiciled in the United States. Nottingham avers that the remaining |7managers visited Louisiana a total of possibly two to three times over the course of the construction. Nottingham asserts that Cor-mier took actions daily (for a period in excess of two years) on behalf of Amitech without the written approval or even knowledge of Amitech’s overseas managers. Particularly, Nottingham notes, among other things, that Cormier negotiated and executed the Design-Build Contract on behalf of Amitech, Nottingham received payments in the form of checks signed by Cormier in excess of $15,000,000.00, and Cormier participated in and consented to the performance of work beyond the scope of the Design-Build Contract for work performed at a cost in excess of $2,000,000.00. Hicks attested that not once did Amitech question, disavow, or challenge the authority of Cormier concerning actions taken on behalf of Ami-tech. As such, Nottingham concludes that it reasonably believed that Cormier had authority to settle the claims at issue.
Despite Nottingham’s position regarding why it assumed a putative mandate existed, we note that Hicks understood that Cormier’s authority was limited. Specifically, in his deposition, Hicks testified that Cormier did not “do anything or approve anything unless they called Hartmut and those guys over there ... We would get approval from them once they talked to their people overseas.” With regard to the cost-plus work, Hicks testified that “it was all done with Hartmut Ludwig’s and the — and all of the board’s approval. Everything had to be approved by the entire *1051 group.” Because Nottingham recognized that Cormier was required to obtain approval, we cannot conclude that a putative mandate with regard to Cormier’s authority to settle existed herein.
Moreover, even assuming a putative mandate existed, we note that Amitech did not provide Cormier express written authority to enter into a settlement agreement. Louisiana Civil Code art. 2997 provides that express authority must be given to enter into a compromise. Louisiana Civil Code article 3072 requires that a compromise “be made in writing or recited in open court.” Because the “law prescribes a certain form for an act, a mandate authorizing the act must be in that form.” LSA-C.C. art. 2993. The comments to LSA-C.C. art. | s2993 explain that when any act, such as a compromise, requires an authentic act or written form, a contract of mandate giving authority to do these acts must also be in authentic or written form. LSA-C.C. art. 2993, comment (c). Therefore, a third party cannot rely upon a putative mandate where the transaction at issue is one for which express authority is required under LSA-C.C. art. 2997. See Hoffman, Siegel, Seydel, Bienvenu & Centola, APLC v. Lee, 05-1491, p. 11 (La.App. 4 Cir. 7/12/06), 936 So.2d 853, 860, writ denied*, 06-1995 (La.11/3/06), 940 So.2d 671 (apparent authority could not be utilized to refer a matter to arbitration where arbitration requires express authority under LSA-C.C. Art. 2997(5)).
Also, Nottingham is charged with knowing the statutory limitations of an agent. In Carey Hodges Associates, Inc. v. Continental Fidelity Corp., 264 So.2d 734, 736 (La.App. 1 Cir.1972), this court noted:
The jurisprudence of this state has been consistent in holding that the person who deals with a corporation is chargeable with notice of the limitations and restrictions placed upon it by statute and is generally bound to know whether or not the person who presumes to represent the corporation and act in its name is authorized to do so. Our jurisprudence holds additionally that the person dealing with an agent is put on his guard by the fact of the person’s alleged agency alone and deals with him at his own risk. - It is his duty to inquire into and ascertain the nature and extent of his powers as an agent and determine whether or not the act or contract about to be consummated comes within the province of his agency and will or will not bind his principal.[5]
Therefore, Nottingham could not rely upon an alleged putative mandate when express written authority was required by LSA-C.C. arts. 2993, 2997, and 3072. As such, assignment of error number one is without merit.[6]
In its second assignment of error, Nottingham urges that the trial court erred in holding a third party may not enforce a settlement agreement against |9the principal based upon estoppel and detrimental reliance as permitted by LSA-C.C. art. 1967.[7] Louisiana Civil Code article 1967 provides:
*1052 Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. Rather, in determining whether a claim for detrimental reliance has been established, the focus is on whether the party proved three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one’s detriment. East Tangipahoa Dev. Co., LLC v. Bedico Junction, LLC, 08-1262, pp. 13-14 (La.App. 1 Cir. 12/23/08), 5 So.3d 238, 246, writ denied, 09-0166 (La.3/27/09), 5 So.3d 146 (citing Suire v. Lafayette City-Parish Consolidated Gov’t, 04-1459, p. 31 (La.4/12/05), 907 So.2d 37, 59.)
Nottingham notes that the Louisiana Supreme Court has indicated that a principal may be estopped from asserting the defense of lack of written authority if the third person can show a change of position in reliance on the appearance of authority manifested by the principal. Tedesco v. Gentry Dev., Inc., 540 So.2d 960, 964 (La.1989). However, as we noted above, Nottingham’s reliance was unreasonable given Hicks’ acknowledgement that Cormier was required to obtain approval from the overseas managers prior to entering into transactions.
| inMoreover, the Louisiana Supreme Court later recognized that “[ajbsent fraud, or at least affirmative misrepresentations as to the necessity of a writing ... it is almost always the case that it will be unreasonable to rely on an oral promise where the law requires such a promise to be in writing to be enforceable.” See Morris v. Friedman, 94-2808, p. 10 n. 14 (La.11/27/95), 663 So.2d 19, 26 n. 14; see also East Tangipahoa Dev. Co., LLC, OS-1262 at pp. 14-15, 5 So.3d at 247. In East Tangipahoa Dev. Co., LLC, this court held that it was not reasonable for the principal of East Tangipahoa Development to rely on an alleged oral agreement where an agreement to repurchase immovable property had to be in writing. East Tangipahoa Dev. Co., LLC 08-1262 at p. 15, 5 So.3d at 247. Because the law requires a writing giving an agent authority to enter into a valid settlement agreement, coupled with the fact that Nottingham was charged with knowledge of the limits of Cormier’s authority, it was unreasonable for Nottingham to rely on Cormier’s representations alone.
. In light of the foregoing, we find that LSA-C.C. art. 1967 cannot be applied under these circumstances. Accordingly, Nottingham’s assignment of error number two is without merit.[8]

. Amitech had three other managers, Hart-mut Ludwig, Wehbe Rafih, and Fareed Kha-lawi, who all resided overseas.

. Ludwig accompanied Cormier on the first visit.

. In the letter, Amitech pledged to pay Nottingham $409,000.00 and enter into a Program Management Agreement to resolve all claims existing between the parties, and Nottingham agreed to cancel a lien that it had placed on Amitech's property. In the Program Management Agreement, Amitech designated Nottingham as Amitech's program manager and/or construction manager for all of Amitech's construction projects from April 15, 2003 through April 14, 2007, with a minimum guaranteed contract amount payable to Nottingham of $1,047,000.00. Although neither party performed pursuant to the Program Management. Agreement, Amitech paid Nottingham the $409,000.00 referenced in the letter and Nottingham cancelled its lien.

. Notwithstanding a 1915(B) designation, we note that nothing precludes a party from seeking a supervisory writ if the circumstances dictate. See LSA-C.C.P. art. 2201.

.Pursuant to Amitech’s operating agreement, however, any significant undertaking required the approval of a majority of Amitech's four managers. Although written resolutions signed by the managers were generally used to approve company undertakings outside of formal board meetings, the record contains no resolution or other writing reflecting that the Board authorized Cormier to settle the dispute.

. Nevertheless, because we find that no putative mandate existed, agency by estoppel cannot be applied herein.

. As a result of the purported settlement agreement, Nottingham contends that it can- *1052 celled its lien and lost the security afforded by the lien up to the amount of $2,700,000.00. However, Hicks also acknowledged that after Nottingham discovered Amitech would not honor the purported settlement agreement, Nottingham secured a new lien.

. In light of our rulings with regard to assignments of error numbers 1 and 2, Nolting- *1053 ham's third assignment of error is also without merit.