GARRETT, J.
liThe plaintiff, Driver Pipeline Company, Inc. (“Driver”), appeals from the grant of a partial summary judgment in favor of the defendant, Cadeville Gas Storage, LLC (“Cadeville”), dismissing several of Driver’s claims. For the following reasons, we reverse and remand to the trial court for further proceedings.
FACTS
On November 9, 2012, Driver and Cade-ville entered into a contract for Driver to construct natural gas pipelines and related facilities in connection with a natural gas storage facility owned by Cadeville in Oua-chita Parish. The contract price was $5,430,130. Cadeville’s obligations included furnishing the actual pipe and all necessary permits and licenses. The contract set forth the specific number of feet of pipeline to be installed and other materials included in the contract price to be fur *494 nished by Driver. The work was to be substantially completed by February 1, 2013, and the final completion date was February 28, 2013.
Driver was not able to complete the work by the scheduled deadlines. Driver contended that the delay was caused by Cadeville’s failures to timely furnish materials it was required to provide, to furnish suitable materials in some instances, and to timely acquire all necessary permits as required by the contract.
In April 2013, Driver submitted several change orders to Cadeville totaling more than $3 million. Some of the work represented by the change orders was done by Driver in January 2013. Cadeville refused to approve and pay the change orders.
|2On May 31, 2013, Driver filed the present suit against Cadeville. Driver alleged that Cadeville breached the contract by failing to provide timely, complete, and accurate engineering drawings and alignment sheets; failing to provide materials it was obligated to provide; failing to deliver pipe in accordance with the specifications of the contract; failing to notify Driver when Cadeville finally obtained the materials it was obligated to provide; making changes in the specifications of the surface facilities covered by the contract; requiring additional erosion control measures beyond the scope of the original contract; instructing Driver to prematurely demobilize for a federal inspection; failing to obtain permits to enter and exit public roads at the most convenient locations; failing to comply with the terms of the contract resulting in Driver and its subcontractors having to demobilize and re-mobilize during the course of the project; failing to compensate Driver for accelerations in the schedule necessitated by Cade-ville’s failure to provide materials required by the contract; failing to have subcontractors under Cadeville’s control perform their work properly; and refusing to execute change orders for extra work and materials required by Cadeville’s default in its obligations. Driver alleged that, according to the extra charges and change orders caused by Cadeville’s default in its obligations, Cadeville owed $4,042,536.95 and an unbilled retention of $3,037.10, for a total claim of $4,045,574.05. Driver sought to recover this amount, along with legal interest and attorney fees.
On July 11, 2013, Cadeville answered the petition and filed a reconventional demand, claiming that Driver breached the contract by not | ^reaching substantial completion on the date specified, failing to provide prompt notice of change orders, charging for items that should have been identified in the bid process, denying Cadeville the right to inspect and/or audit Driver’s books or records of subcontractors as provided in the contract, failing to employ only competent and skilled supervisors and forepersons, and failing to perform all work in a good and workmanlike manner. Cadeville claimed that it sustained additional costs and damages caused by Driver’s failures under the contract. On September 6, 2013, Cadeville filed a first amended and supplemental answer and re-conventional demand.
On September 16, 2013, Cadeville filed the motion for partial summary judgment. The motion sought to dismiss with prejudice Driver’s claims related to disputed change orders. Cadeville argued that the parties specified in their contract that change orders were highly discouraged and that prior written approval was necessary before changes could be implemented. Cadeville contended that Driver ignored the terms of the contract and on April 1, 2013, submitted seven change orders for which Cadeville’s prior written approval was not obtained:
*495 Change Order 17 $ 16,341.00 2514’ Additional Silt Fence .
Change Order 18 $ 4,132.00 285 Hay Bales
Change Order 19 $ 33,300.00 Additional 24" River Weights
Change Order 20 $ 120,750.00 Pierce to Accelerate Schedule
Change Order 21 $ 188,926.18 Jones Brothers Trucking Extra Costs
Change Order 22 $ 131,600.00 376 Additional Mats
Change Order 23 $ 22,944.00 24 Additional 24" Welds
On April 12, 2013, Driver submitted four more change orders:
Change Order 24 $ 358,759.21 Blue Fin Charges
Change Order 25 $2,045,877.00 Driver Acceleration
LChange Order 26 $ 132,480.00 Pierce to accelerate schedule
Change Order 27 $ 120,689.60 Pierce to accelerate schedule
Cadeville contended the contract required that Driver provide a cost estimate and obtain written approval from Cadeville before doing any additional work or using additional materials. Because Driver did not comply with the requirements of the contract concerning change orders, Cade-ville argued it was entitled, as a matter of law, to a partial summary judgment dismissing with prejudice Driver’s claims regarding the 11 change orders.
The parties were also embroiled in unresolved discovery disputes. Driver filed a motion to compel discovery on November 12, 2013, and an opposition to the motion for partial summary judgment on November 25, 2013. Hearings on both motions were held on December 4, 2013. Driver’s motion to compel was argued first and was granted.[1] The trial court then granted partial summary judgment in favor of Cadeville, dismissing Driver’s claims as to Change Orders 17-27. The trial court adopted Cadeville’s position that there could be no oral modification of the agreement. The judgment was certified as an appealable final judgment.
Driver appealed, urging two separate issues: (1) the trial court should not have considered the motion for partial summary judgment on the same lúdate that it granted the motion to compel discovery; and (2) the trial court erred in granting the motion for partial summary judgment. We will address the second argument first. Because we find that the trial court erred in granting the motion for partial summary judgment, we pretermit discussion of the first issue.
CHANGE ORDERS AND SUMMARY JUDGMENT
Driver argues that the trial court erred in granting the motion for partial summary judgment as to the “adder” and “extra work” change orders, as well as for the “extra cost” change orders, because there are genuine issues of material fact as to *496 whether, under the various terms of the contract, Cadeville was required to pay for these items. These arguments have merit.
Legal Principles
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880; Amos v. Crouch, 46,456 (La.App.2d Cir.6/29/11), 71 So.3d 1053; Carter Enterprises, LLC v. Scott Equipment Co., LLC, 46,862 (La.App.2d Cir.4/11/12), 91 So.3d 1134. Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of actions. La. C.C.P. art. 966(A)(2); Finley v. Racetrac Petroleum, Inc., 48,923 (La.App.2d Cir.4/9/14), 137 So.3d 193; Jenkins v. Willis Knighton Med. Ctr., 43,254 (La.App.2d Cir.6/4/08), 986 So.2d 247, writ not cons., 2008-1507 (La.10/10/08), 993 So.2d 1273. Appellate courts review summary judgments de novo, under the same criteria that govern a district ^court's consideration of whether summary judgment is appropriate. Costello v. Hardy, 2003-1146 (La.1/21/04), 864 So.2d 129; Finley v. Racetrac Petroleum, Inc., supra; Jenkins v. Willis Knighton Med. Ctr., supra. A court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for the purposes of the motion for summary judgment, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Finley v. Racetrac Petroleum, Inc., supra. A fact is material if its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Amos v. Crouch, supra; Carter Enterprises, LLC v. Scott Equipment Co., LLC, supra.
The moving party bears the burden of proof. However, if the movant will not bear the burden of proof at trial on the matter before the court on the motion for summary judgment, the movant is not required to negate all essential elements of the adverse party’s claim, action, or defenses; he need only point out an absence of factual support for one or more essential elements of the adverse party’s claim, action or defenses. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact and summary judgment is appropriate. La. C.C.P. art. 966(C)(2); Carter Enterprises, LLC v. Scott Equipment Co., LLC, supra; Hakim v. O’Donnell, 49,140 (La.App.2d Cir.6/25/14), 144 So.3d 1179.
|7A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case as to that party or parties. La. C.C.P. art. 966(E).
When a court renders a partial summary judgment as to one or more but less than all of the claims, demands, issues, or theories against a party, whether in the original demand, reconventional demand, cross-claim, third party claim, or intervention, the judgment shall not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay. La. C.C.P. art. 1915(B)(1).
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. Contracts have the effect of law for the parties. La. C.C. art. 1983. Interpretation of a contract is the determination *497 of the common intent of the parties.. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. art. 2049. Each provision in a contract must be interpreted in light of the other provisions so, that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties | sbefore and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053.
Although parol evidence is inadmissible to vary the terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intention of the parties. Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981); ScenicLand Const. Co., LLC v. St. Francis Med. Ctr., Inc., 41,147 (La. App.2d Cir.7/26/06), 936 So.2d 247.
In this posture, determination of the intent of the parties becomes a question of fact and the granting of summary judgment is appropriate only if there are no genuine issues of material fact. First Bank & Trust v. Redman Gaming of Louisiana, Inc., 13-369 (La.App.5th Cir.12/12/13), 131 So.3d 224.
Discussion
As to the “adder” and “extra work” change orders (change orders 17-19, 22-23), Driver urges that the express language of the contract required Cadeville to pay for the additional scheduled items. Driver contends that the change orders were not necessary, but were a convenient method for invoicing the costs to Cadeville. The contract, in Exhibit C, General Terms and Conditions, addresses changes in the work. Section 9, dealing with changes in work, Paragraphs 9.1 and 9.2 of that section provide:
9.1 Company [Cadeville] may at any time omit, change, alter or add to Work to be performed hereunder by Contractor |9[Priver] and in connection therewith issue additional or revised Specifications, Drawings and written instructions. Contractor shall perform such Work in accordance with such revised Specifications, Drawings and written instruction and pursuant to written authorization executed by Company or Company’s Representative and otherwise in accordance with the provisions of this Contract.
9.2 If such additions, changes or alterations involve Work for which a price is set forth in the Contract Pricing Schedule, Contractor shall be paid for such Work at the price set forth therein. If such additions, changes, or alterations involve Work for which no price is set forth in the Contract Pricing Schedule, Contractor will provide Company with a cost estimate and additional time, if any, required to perform the Work in the form of a Change Order. Contractor shall before the fact obtain written approval from the Company for this work. Such Work shall be performed for a lump sum amount or unit price or, if agreed to by the Company, on a time and material basis, or on any other method agreed upon in writing by the Parties prior to the commencement of such Work. Any unavoidable delays in *498 curred by Contractor in the Work Schedule while awaiting the negotiation and/or approval of any Change Order by Company shall result in additional compensation to Contractor for standby time in accordance with the rate schedules attached to Exhibit B and the completions dates extended a day for a day.
Driver asserts that change orders 17, 18, and 22 fall under the unit price schedule contained in Exhibit B of the contract, which provided the pricing for additional quantities of materials to be furnished by Driver, such as silt fence, hay bales, and mats in excess of those provided for in the basic contract. The basic contract included 20,000 linear feet of silt fence, 200 hay bales, and 500 16-foot mats. The price for additional silt fence in excess of that included in the contract was $6.50 per linear foot; additional hay bales cost $14 each; additional mats cost $350 each. Regarding the method for billing for these additional items, the contract contained the [ mfollowing provision in Exhibit B, Item C, dealing with the unit price schedule:
The items provided below are included in the base lay price at the quantities identified for each item, if any. Each item will be tracked within the .weekly report and will be paid on a unit price basis if quantities exceed the limits shown below. Installation will be tracked on a daily basis and paid in addition to base lay progress payments, defined in Item A above. Contractor and Company will work together to identify the need for additional quantities and execute an appropriate Change Order prior to the installation of any additional items below. However, should an event requiring a Change Order arise that could not have been reasonably foreseen by Contractor and which would cause a delay in the progress of the Work, Contractor shall immediately notify Company of such event, and Company shall have the right (but not the obligation) to give expedited approval of the change by any written document signed by a Company Representative, and such written document (which may include a written confirmation by electronic communication) shall be sufficient for Contractor to proceed, provided that the forgoing expedited procedures may not be used for a change exceeding $12,000 or series of changes related to one event exceeding $25,000 in value, in the aggregate, and if used, Contractor shall thereafter promptly submit a written Change Order, referencing and conforming to such written authorization, for Company’s signature.
Driver maintains that Cadeville was aware of the amount of these items used on a daily basis, due to notices given by Driver in the daily reports.
Driver contends that change orders 19 and 23 fall under the unit price schedule in the contract for extra work only. Change order 19 concerned the installation of additional river weights for 24-inch pipe. The contract provided that Driver would furnish labor, equipment, and materials to install saddlebag river weights as directed by Cadeville’s representative. Driver was to use 5,000-pound weights for 24-inch pipe. The cost of installation of each of these weights was $3,700. The pricing schedule for extra work also Inspecified that additional welds on 24-inch pipe would cost $956 each. Again, Driver argues that, under the terms of the contract, a change order was not required. Also, as to the river weights and additional welds, Driver maintains that persons employed by Cadeville, with authority to make decisions, approved those changes. Therefore, Cadeville was required to pay for these items.
*499 Driver also claims that the trial court erred in granting the motion for partial summary judgment as to the “extra cost” change orders (change orders 20-21, 24-27). According to Driver, these extra costs were caused by Cadeville’s failure to meet its obligations under the contract. Again, under the terms of the contract, Driver maintains that change orders were not necessary. Driver cites the following portions of the contract in support of its argument:
Exhibit C, General Terms and Conditions, Section 4, dealing with materials furnished by the company, Paragraph 4.1, specifies:
Company shall pay for and furnish to Contractor at the Work Site all pipe, valves, fittings, and other materials listed in Exhibit F. Except as listed on Exhibit F, Company shall have no responsibility whatsoever to furnish any other materials or equipment. Contractor agrees to accept custody of materials furnished by Company and to bear all. costs of unloading all such Company furnished materials and all costs of further transportation of such materials except as otherwise specifically provided for in the Contract Pricing Schedule. Contractor and Company will develop a delivery schedule for Company provided materials. Any and all production schedule delays and additional costs incurred by Contractor due to delays associated with material availability or delivery shall be at the expense of Company.
|12Exhibit C, General Terms and Conditions, Section 5, dealing with rights-of-way, permits, and licenses, Paragraph 5.1, provides:
Company agrees to furnish to Contractor the necessary property and right-of-way (servitudes) to adequately and efficiently conduct operations required for the prosecution of the Work (referred to as “Work Site ”) at the location and of the size shown on the Construction Drawings which shall include sufficient temporary land needed as workspace during construction. Company also agrees to furnish permits or licenses where required for construction across railroads, highways, rivers and other such places, as delineated in Exhibit J.
Exhibit C, General Terms and Conditions, Section 10, dealing with prosecution of work, Paragraph 10.2,. states:
If, after commencement of the Work by Contractor, Contractor is delayed in the completion of the Work due to the acts or omissions of Company in failing to furnish equipment, material, Work Site, Change Orders, permits or licenses required by this Contract in order to perform the Work in an effective, contiguous and efficient manner, or due to Force Majeure, Contractor shall be compensated in accordance with Exhibit B and the time for completion shall be extended for a period equivalent to the duration of such delay(s), subject to the other terms of this Contract and the exhibits attached hereto.
According, to Driver, the charges represented by the extra cost change orders were- for work required to accelerate the completion schedule of the project. Driver contends that delays in the completion of the project were caused by Cadeville’s failure to provide pipe in the most efficient lengths and to obtain the necessary permits to work on and to provide access to the rights of way. At one point, Driver alleges that Cadeville did not have any pipe available when needed, almost causing the project to shut down. When Cadeville did acquire the pipe, it requested that Driver accelerate the work to get back on schedule. Driver said that Cadeville’s failure to timely fulfill |isits obligations impacted Driver’s subcontractors, Jones *500 Brothers Trucking, Pierce Construction and Maintenance Co., Inc., and Blue Fin Services, LLC. Driver argues that, as to these change orders, there is &■ genuine issue of material fact as to Cadeville’s obligation to pay.
In addition, Driver submitted evidence in opposition to the motion for partial summary judgment which indicated that Cade-ville had in fact paid for additional work that had been performed without requiring any prior approval or signed change orders.
Needless to say, the contract in this case contains many complex provisions. Although Driver continues to frame the issue as being very straightforward, we disagree. We find that there are both legal issues and numerous genuine issues of material fact regarding Cadeville’s obligation to pay the disputed change orders. There are disputed issues of material fact as to whether change orders were necessary, whether Cadeville was required to execute change orders, and whether Cade-ville representatives gave approval for the additional charges. There are also genuine issues of material fact as to whether some of the charges were caused by Cade-ville’s breach of the contract, making it liable for the charges. Because legal issues and genuine issues of material fact exist, we cannot say that Cadeville is entitled to summary judgment as a matter of law. The trial court erred in granting partial summary judgment in favor of Cadeville.
MODIFICATION OF WRITTEN CONTRACT
Driver also claims that the trial court erred in granting the motion for partial summary judgment despite the existence of numerous issues of 114material fact as to whether the contract between the parties had been modified orally, or by silence, inaction, or implication, as provided for in the jurisprudence of Louisiana. This argument also has merit.
Legal Principles
Agreements entered into have the effect of law upon the parties thereto. La. C.C. art. 1983. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. La. C.C. art. 1927; Grosjean v. Grosjean, 45,529 (La.App.2d Cir.10/13/10), ,50 So.3d 233, writ denied, 2010-2623 (La.2/4/11), 57 So.3d 311, and writ denied, 2010-2619 (La.2/4/11), 56 So.3d 980.
An agreement may be modified or abrogated by the mutual consent of the parties. The law is clear that written contracts may be modified by oral contracts and the conduct of the parties. Grosjean v. Grosjean, supra; Smith v. Coffman, 46,793 (La. App.2d Cir.2/8/12), 87 So.3d 137.
La. C.C. art. 1848 provides:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.
A written construction contract may be modified by oral agreement and by the conduct of the parties, even when the contract provides that change orders must be in writing. Wisinger v. Casten, 550 So.2d 685 (La.App. 2d Cir.1989); Rhodes Steel Bldgs., Inc. v. Walker Const. Co., 35,917 (La.App.2d Cir.4/3/02), 813 So.2d 1171. See also Pelican Elec. 11BContractors v. Neumeyer, 419 So.2d 1 (La.App. 4th Cir.1982), writ denied, 423 *501 So.2d 1150 (La.1982); Newman Marchive P’ship, Inc. v. City of Shreveport, 41,460 (La.App.2d Cir.11/1/06), 944 So.2d 703, writ denied, 2007-0060 (La.3/9/07), 949 So.2d 448, and writ denied, 2007-0097 (La.3/9/07), 949 So.2d 452; Amitech U.S.A., Ltd. v. Nottingham Const. Co., 2009-2048 (La.App.lst Cir.10/29/10), 57 So.3d 1043, writ denied, 2011-0866 (La.6/17/11), 63 So.3d 1036, and writ denied, 2011-0953 (La.6/17/11), 63 So.3d 1043; Bonvillain Builders, LLC v. Gentile, 2008-1994 (La.App.lst Cir.10/30/09), 29 So.3d 625, writ denied, 2010-0059 (La.3/26/10), 29 So.3d 1264; Fleming v. JE Merit Constructors, Inc., 2007-0926 (La.App.lst Cir.3/19/08), 985 So.2d 141; Cajun Constructors, Inc. v. Fleming Const. Co., Inc., 2005-2003 (La.App.lst Cir.11/15/06), 951 So.2d 208, writ denied, 2007-0420 (La.4/5/07), 954 So.2d 146; Aqua Pool Renovations, Inc. v. Paradise Manor Cmty. Club, Inc., 04-119 (La.App.5th Cir.7/27/04), 880 So.2d 875.
Modification of a written agreement can be presumed by silence, inaction, or implication. Fleming v. JE Merit Constructors, Inc., supra; Amitech U.S.A., Ltd. v. Nottingham Const. Co., supra. Whether there is an oral agreement that modified the written contract is a question of fact. Wisinger v. Casten, supra; Pelican Elec. Contractors v. Neumeyer, supra. The party asserting modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. Cajun Constructors, Inc. v. Fleming Const. Co., Inc., supra.
|! (¿Discussion
Cadeville cites and relies upon two sections of the contract in support of its argument that the agreement could not be subsequently amended orally or by silence, action, or inaction. The first section, Article VI, of the main portion of the contract provides:
This Contract and the Exhibits hereto constitute the entire agreement between the Parties hereto with respect to the matters covered hereby. No statements, representations, warranties, or agreements with respect to such matters, written or oral, except those expressly set out in this Contract or expressly incorporated herein by reference, shall have any further force or effect between the Parties, or shall same be relied on by the Parties hereto, it being agreed that this Contract supersedes all prior negotiations and understandings. This Contract can be hereafter modified or amended only by a document duly executed by the authorized official of each of the Parties. This Contract shall be binding upon the Parties hereto, their heirs, executors, administrators, successors or permitted assigns.
This provision is similar to that discussed in Salley v. Louviere, 183 La. 92, 162 So. 811 (1935), in which the Louisiana Supreme Court considered a case involving a written lease contract in which the lessor denied that an oral agreement had been made to terminate the lease early. The lessor cited a provision in the lease that she was entitled to a 60-day written notice of the termination of the lease.. The lessee sought to show that the parties agreed orally to terminate the lease. In interpreting the lease agreement and the effect of any subsequent oral modification, the supreme court construed former La. C.C. art. 2276, which provided that parol evidence shall not be admitted against or beyond what is contained in a [17written contract, nor on what may have been said -before, or at the time of the making of the *502 contract, or since.[2] The court in Salley stated:
This article of the Code is not to be construed so as to forbid the proving by parol evidence of a subsequent agreement modifying or abrogating a written contract of a character which the law does not require to be in writing. It is true that the article says that parol evidence shall not be admitted to prove what may have been said by the parties to a written contract, before or at the time of making the contract, or since. But the meaning is that parol evidence as to what the parties to a written contract may have said at any time shall not be admitted for the purpose of proving that they had an antecedent or a contemporaneous agreement contrary to that which was reduced to writing. The words “or since” have reference to the phrase “what may have been said,” and not to what may have been agreed to, since the making of the written contract. It is well settled that this article of the Civil Code does not forbid the proving by parol evidence of a subsequent agreement to modify or to revoke a written agreement. [Emphasis supplied.]
The court concluded that the lessee proved a verbal agreement to terminate the lease. See also Shreveport Plaza Associates Ltd. P’ship v. L.R. Res. II, 557 So.2d 1067 (La.App. 2d Cir.1990); Walilder v. Tiger Stop, Inc., 391 So.2d 535 (La.App. 3d Cir. 1980), writ denied, 396 So.2d 1351 (La. 1981).
An integration clause, such as that found in Article VI of the contract in this case, precludes any prior or contemporaneous agreements which are not set forth in the contract. It does not prohibit subsequent agreements or modifications which may be made orally, or by silence, inaction, or implication.
In further support of its argument that the agreement between the parties could only be modified in writing, Cadeville cites Harnischfeger \KSale Corp. v. Sternberg Co., 179 La. 317, 154 So. 10 (1934), and Henning Const., Inc. v. First Eastern Bank and Trust Co., 92-0435 (La.App.4th Cir.3/15/94), 635 So.2d 273, ivrit denied, 94-1544 (La.9/30/94), 642 So.2d 870, which also deal with integration clauses. These cases are inapposite to the facts of the present matter. In Hamischfeger, a suit for the balance due on a promissory note, the defendant sought to show that it did not have the obligation to pay for a drag-line machine because, at the time of the purchase, the seller represented that the machine could do work which, in fact, it could not do. The supreme court found parol evidence of the alleged warranty language to be inadmissible because the contract provided that there were no “understandings, representations, or agreements between the parties not herein expressed.” The court would not allow evidence of pri- or or contemporaneous oral agreements. This holding was in accordance with former La. C.C. art. 2276, as interpreted in Salley v. Louviere, supra. The facts of Hamischfeger did not concern a subsequent oral agreement and, therefore, the case has no application in the matter before us.
In Henning, the fourth circuit considered a suit on promissory notes which specified that the notes constituted the entire agreement between the parties. On appeal, the plaintiff argued that the trial court erred in finding that the notes con *503 stituted the entire agreement between the parties. There was no indication in the case as to what other agreement the defendant claimed to exist. The fourth circuit concluded that the notes were the entire agreement between the parties. We observe that Henning is governed by the Uniform Commercial Code (“UCC”) on negotiable instruments, contained | l9in La. R.S. 10:3-101 et seq. The UCC establishes a very specific statutory scheme that applies to negotiable instruments, such as considered in Henning. La. R.S. 10:3-117 provides:
Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified only by a separate written agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement. To the extent an obligation is modified, supplemented, or nullified by an agreement under this Section, the agreement is a defense to the obligation.
This provision imposes a statutory .requirement for a separate written agreement to modify, supplement, or nullify a negotiable instrument. The UCC laws on negotiable instruments do not apply to construction contracts, which are at issue in the present case. Therefore, Henning is not applicable to this matter.
Cadeville also argues that Chrysler Fin. Corp. v. Zupanovic, 98-2142 (La.App.4th Cir.3/17/99), 735 So.2d 60, and Chrysler Fin. Corp. v. Thompson, 99-1931 (La. App.4th Cir.11/10/99), 746 So.2d 802, stand for the proposition that a subsequent oral modification of a written agreement is ineffective where the agreement states that no modification of the contract is valid unless made in writing. These cases do not cite any legal authority for the decisions. We observe that both cases concern motor vehicle credit transactions. These transactions are governed by the Louisiana Motor Vehicle Sales Finance Act (“LMVSFA”) found in La. R.S. 6:969.1 et seq. This very specific statutory scheme contemplates an original agreement in |20writing for enforceability.[3] It provides that a consumer may not waive or agree to forgo the rights and benefits of the Act. La. R.S. 6:969.4. The present case does not concern the purchase of a motor vehicle and this statutory scheme has no application to the present matter.
Cadeville also cites another portion of the contract with Driver in support of its argument that the contract could not be subsequently amended except in writing. The contract contained the following provision regarding change orders in Exhibit B, Item (A)(5):
Contractor acknowledges that all of the documentation provided by Company has been reviewed, including the scope of the work, and understands the associated risks, difficulties, and responsibilities pursuant to the Work. Contractor also acknowledges that Change Orders are highly discouraged by the Company and that Company will not approve a Change Order for any change or addition that Contractor should have identified during the bidding process. Should Contractor determine during the performance of the Work that the Compa *504 ny-provided scope of work, drawings and specifications upon which Contrae-tor developed its pricing contain any previously unidentified error of a material nature then Contractor shall give Company prompt written notice of such error, in reasonable detail. Contractor shall be entitled to a Change Order for any additional costs to Contractor which are directly related to such previously undiscovered error, other than an error that should have been reasonably discovered or determined by Contractor during its due diligence review of such bid documentation.
As set forth above, the law and jurisprudence are clear that, even when a contract states that a change order must be in writing, a change can be made orally, by silence, inaction, or implication. While Cadeville |2i contends that the parties “opted out” of this jurisprudence, it has presented no authority for its position that a court would be absolutely precluded from finding that such a modification has in fact occurred. Cadeville’s contention that Rhodes Steel Bldgs., Inc. v. Walker Const. Co., supra, supports its position is an incorrect interpretation of the law. In Rhodes, the plaintiff contended it had a subsequent agreement with a general contractor to do additional work on a building project not included in the original contract between the parties. The trial court refused to allow evidence of oral modifications of the contract. This court reversed that decision, noting the extensive jurisprudence set forth above, that written construction contracts may be modified by oral contracts and the conduct of the parties even when the original contract contains a provision that change orders must be in writing. This court then made a casual observation that the contract in Rhodes did not prohibit oral modification of the written provisions. That statement does not serve as authority for the “opt out” argument and legal theory advanced by Cadeville. Although the contract in Rhodes did not prohibit oral modification, even if it had, as noted by the court in that case, oral modifications still could have been proven.
Cadeville further cites Lantech Const. Co., LLC v. Speed, 08-811 (La.App.5th Cir.5/26/09), 15 So.3d 289, in support of its argument. In Lantech, a contract apparently required written change orders. The plaintiff sought to recover additional charges based upon oral change orders. Citing the well-settled law that written contracts can be modified by oral contracts and the conduct of the parties, even when the written contract contains aj^provision that change orders must be in writing, the trial and appellate courts allowed recovery for change orders. In part, Cadeville bases its argument that it “opted out” of Louisiana legal principles on the following language'in Lantech:
The contract in question clearly requires written requests for modification. Nevertheless, the contract does not expressly prohibit oral modification.
This language is contradictory and we do not find that Lantech supports Cadeville’s position. As conceded by Cadeville in argument before the trial court and this court, if the law regarding oral amendments applies to this case, then there are genuine issues of material fact that have been raised as to whether there was an oral agreement to modify the original contract. In this case, the plaintiff submitted evidence in opposition to the motion for partial summary judgment that Cadeville had paid for work that had not been approved in writing and thus, the parties had deviated from the contract provisions that Cadeville now seeks to rely upon. We also note that the plaintiff produced some email communications between the parties. One *505 email regarding crew delays concludes, “In short, foreseeable costs to Cadeville will be Cadeville’s responsibility, and foreseeable costs to Driver (and expediting costs) will be Driver’s responsibility. Please proceed accordingly.” At the very least, the evidence submitted by the plaintiff demonstrates that there is a genuine issue of material fact as to whether the parties had modified the terms of their written contract.
We find that the jurisprudence allowing a party to a construction contract to prove the modification of a written contract orally or by silence, | ^inaction, or implication, even where the contract provides that modifications must be in writing, applies here. The facts of the present case fit squarely with the extensive and well-settled law on this issue. The trial court erred in holding otherwise.[4]
CONCLUSION
For the reasons stated above, we reverse the decision of the trial court granting partial summary judgment in favor of the defendant, Cadeville Gas Storage, LLC, dismissing the claims of the plaintiff, Driver Pipeline Company, Inc., regarding the change orders discussed herein. The matter is | ^remanded to the trial court for further proceedings. Costs in this court are assessed to Cadeville Gas Storage, LLC.
REVERSED; REMANDED FOR FURTHER PROCEEDINGS.

. The record indicates that the parties were involved in a very contentious discovery dispute which began in June 2013, when Driver propounded interrogatories and requests for production of documents. Although some 12,000 pages of documents were produced, the parties had serious disagreements concerning the method by which additional documents would be produced. Cadeville suggested a web page and database created by its attorneys, to which Driver objected. Numerous letters and emails followed and the parties reached an impasse, which resulted in the motion to compel. After Driver prevailed on the motion to compel, it appears from arguments made to this court. that more than 38,000 additional documents were produced.

. La. C.C. art. 1848, Revision Comments-1984, (a) state that this provision reproduces the substance of former La. C.C. art. 2276, and incorporates exceptions recognized by the Louisiana jurisprudence.

. La. R.S. 6:969.6(10) defines a contract under the LMVSFA as:
"Contract” means the consumer’s retail installment contract, note, agreement, or other evidence of indebtedness executed in connection with a motor vehicle credit transaction.

. It appears that the trial court ruling in this case was influenced, in part, by Cadeville’s argument that it would be more expeditious, from an appellate review standpoint, for the trial court to grant the motion for partial summary judgment as opposed to denying the relief. The following colloquy occurred immediately before the trial court ruled from the bench that it would grant the motion for partial summary judgment:
[Cadeville’s counsel]: Let's see what the Second Circuit says. Let’s see if the Second Circuit was serious when they decided Rhodes Steel. We can always come back if we’re wrong. We can always come back and try this case but our only chance now to save the court resources-my client, their client, the resources and get a read on whether this means anything is to grant the summary judgment, certify it as final, and let's go have it heard. In the meantime, we can do all the discovery they need to do on our reconventional demands and be ready to go when the, six or eight months from now, when the Second Circuit tells us the deal. But if we lose this moment, we're launching off.
[The trial court]: You could take writs. [Cadeville’s counsel]: Certainly I can, Your Honor, but'—
[The trial court]: You can take writs on it. [Cadeville's counsel]: But we know how hard it is for me to get the Second Circuit to pick up on a writ.
[The trial court]: They may overrule my decision. They’ve done so in the past so— won’t hurt my feelings. I mean, that’s what they're there for.
[Cadeville's counsel]: But, Your Honor, if you grant it then we get to get it decided in the short term.
[The trial court]: I understand.